Terry MOSER, Petitioner and
Appellant,

v.

NORTH DAKOTA STATE HIGHWAY
COMMISSIONER, Respondent
and Appellee.

Civ. No. 10881.

Supreme Court of North Dakota.

June 10, 1985.

Hjellum, Weiss, Nerison, Jukkala,
Wright & Paulson, Jamestown, for petition-
er and appellant; argued by James A.
Wright; appearance by Cecelia Ann Wick-
enheiser, Jamestown.

Robert E. Lane, Asst. Atty. Gen., Bis-
marck, for respondent and appellee.

LEVINE, Justice.

Terry Moser (Moser) appeals from a district court judgment affirming a decision of the North Dakota State Highway Commissioner (Commissioner) to suspend Moser's driver's license pursuant to North Dakota Century Code Ch. 39–20. We reverse.

Moser was involved in a one-vehicle rollover accident on September 14, 1984. He was arrested for operating a motor vehicle in violation of NDCC § 39–08–01[1] or equivalent ordinance. Moser was administered a Breathalyzer test, which indicated a blood alcohol concentration of 0.19 percent by weight. The arresting officer took possession of Moser's driver's license pursuant to NDCC § 39–20–03.1.[2] Moser requested and received an administrative hearing pursuant to NDCC § 39–20–05.[3]

At the conclusion of the administrative hearing, the Commissioner's hearing officer made the following findings of fact, conclusions of law, and decision:

"Findings of fact are that Officer Nustad was stopped by a truck driver who re-

1. Section 39–08–01, NDCC, provides in part:

"1. A person may not drive any vehicle upon a highway or upon public or private areas to which the public has a right of access for vehicular use in this state if any of the following apply:

a. That person has a blood alcohol concentration of at least ten one-hundredths of one percent by weight at the time of the performance of a chemical test within two hours after the driving.

b. That person is under the influence of intoxicating liquor."

2. NDCC § 39–20–03.1 provides:

"If a person refused to submit to a test as provided under section 39–20–01 or 39–20–14, or if a person submits to a test under section 39–20–01, 39–20–02, or 39–20–03 and the test shows that person to have a blood alcohol concentration of at least ten one-hundredths of one percent by weight at the time of the performance of a chemical test within two hours after the driving, the following procedures apply:

1. The law enforcement officer shall immediately take possession of that person's operator's license and shall immediately issue to that person a temporary operator's permit extending driving privileges for the next twenty days. The law enforcement officer shall sign and note the date on the temporary operator's permit. The temporary operator's permit serves as the department's official notification to the person of the department's intent to revoke, suspend, or deny driving privileges in this state.

. . . . .

3. The law enforcement officer, within five days of issuing the temporary operator's permit, shall forward to the commissioner a sworn report and the person's operator's license taken under subsection 1 or 2. If the person was issued a temporary operator's permit because of the person's refusal to submit to a test or tests under section 39–20–01 or section 39–20–14, the sworn report shall include information as provided in section 39–20–04. If the person was issued a temporary operator's permit because of the results of a test, the sworn report must show that the officer had reasonable grounds to believe the person had been driving or was in actual physical control of a motor vehicle while in violation of section 39–08–01, or equivalent ordinance, that the person was lawfully arrested, that the person was tested in accordance with section 39–20–01, 39–20–02, or 39–20–03, and that the results of the test show that the person had a blood alcohol concentration of at least ten one-hundredths of one percent by weight."

3. NDCC § 39–20–05 provides:

"1. Before issuing an order of suspension, revocation, or denial under section 39–20–04 or section 39–20–04.1, the commissioner shall give the person a written notice of intention to revoke, suspend, or deny and afford that person an opportunity for a hearing if the person mails a request for the hearing to the commissioner within five days after the issuance of the temporary operator's permit. The hearing must be held within twenty days after the date of issuance of the temporary operator's permit.

"2. If the issue to be determined by the hearing concerns the license suspension for operating a motor vehicle while having a blood alcohol concentration of at least ten one-hundredths of one percent by weight, the hearing must be before a hearing officer assigned by the commissioner and at the time and place designated by the commissioner. The hearing must be recorded and its scope may cover only the issues of whether the arresting officer had reasonable grounds to believe the person had been driving or was in actual physical control of a vehicle in violation of 39–08–01 or equivalent ordinance; whether the person was placed under arrest; whether the person was tested in accordance with section 39–20–01 or 39–20–03 and, if applicable, section 39–20–02; and whether, based on a review of the test procedures and results, the person had a blood alcohol concentration of at least ten one-hundredths of one percent by weight. Whether the person was informed that the privilege to drive might be suspended based on the results of the test is not an issue."

ported he saw a pickup vehicle rolled over in a ditch, Highway 281 North. Officer Nustad went to the location. The driver was not at the scene when he arrived. Approximately 10 minutes later Mr. Moser arrived and stated he had gone for help and he had driven the vehicle. He lost control and rolled over. Officer Nustad asked the driver if he had been drinking; the driver stated that he had. Officer Nustad placed Mr. Moser under arrest for DUI. He gave the ALERT test which he failed. Mr. Moser was transported to the Jamestown Police Station. He was offered a chemical test of his breath which he submitted to. The test results showed he had .19 percent blood-alcohol concentration by weight.

"The conclusions of law, I find Officer Nustad had the grounds to believe Mr. Moser violated Section 39–08–01 of the North Dakota Century Code. I find Mr. Moser was arrested. I find Mr. Moser was tested in accordance with 39–20–01, and 39–20–02 of the North Dakota Century Code. I find Mr. Moser was fairly tested and the results showed he [had] more than .10 percent blood-alcohol concentration by weight."

The hearing officer suspended Moser's driving privileges for 90 days, pursuant to NDCC § 39–20–04.1.

Moser appealed to the district court, which affirmed the administrative hearing officer's decision. Moser appealed the district court judgment and he has raised the following issues:

"I.

"Did the arresting officer have reasonable grounds to believe that Moser had been driving under the influence of intoxicating liquor?

II.

"Was Moser's breathalyzer test 'fairly administered' according to the approved method promulgated by the North Dakota State Toxicologist?

"III.

"Was Moser tested within two hours after driving as required by Section 39–20–03.1 of the North Dakota Century Code?"

■ An appeal from a district court judgment involving a license suspension under NDCC § 39–20–04.1 is governed by the Administrative Agencies Practice Act, NDCC Chapter 28–32, and we, therefore, look to the record compiled before the administrative agency, rather than the findings of the district court. *Dodds v. North Dakota State Highway Commissioner,* 354 N.W.2d 165 (N.D.1984).

"Our role in reviewing the factual basis of an administrative decision is limited to a consideration of the following questions: '(1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law?' *Asbridge, supra.* [*Asbridge v. North Dakota State Highway Commissioner,* 291 N.W.2d 739 (N.D.1980).] This Court also considers whether the decision violates constitutional rights or is not in accordance with the law. *See,* § 28–32–19, N.D.C.C. We exercise restraint in reviewing the findings of an administrative agency; we do not substitute our judgment for that of the agency. [Citation omitted]." *Dodds, supra,* 354 N.W.2d at 168–169.

I.

■ Moser argues that the arresting officer did not have reasonable grounds to believe that Moser had been driving in violation of NDCC § 39–08–01. See NDCC § 39–20–05. We disagree. The term "reasonable grounds" is synonymous with the term "probable cause." *Witte v. Hjelle,* 234 N.W.2d 16 (N.D.1975). We held, in Syllabus ¶ 3, in *Witte v. Hjelle, supra:*

"Probable cause exists when the facts and circumstances within a police officer's knowledge and of which he had reasonably trustworthy information are

sufficient to warrant a man of reasonable caution in believing that an offense has been or is being committed."

■ The arresting officer was informed by a truck driver that there was a "pickup rolled over in a ditch" on Highway 281 North in Jamestown. No one was at the accident scene when the officer arrived. When Moser arrived at the accident scene approximately ten minutes later with two other persons, he stated that he was the driver of the vehicle and admitted that he had been drinking beer and lost control of the vehicle. This evidence, coupled with the lack of any suggestion of another cause of the accident, is "sufficient to warrant a man of reasonable caution in believing" that the offense of driving in violation of NDCC § 39–08–01 had been committed. We also note that in the Officer's Statement of Probable Cause contained in an exhibit received without objection during the administrative hearing, the arresting officer stated that he could smell alcohol on Moser's breath and Moser's eyes were bloodshot. The arresting officer had reasonable grounds to believe that Moser had been driving a vehicle in violation of NDCC § 39–08–01.

## II.

The Breathalyzer machine involved had a "zero line" and a "start line" at which the various tests involved in a Breathalyzer test are to be started. The machine has a scale for indicating a percentage of blood alcohol. The scale begins with 0.00 percent on the left with gradations to 0.40 on the right side.

One of the tests involved in a Breathalyzer test is a "standard test." The Breathalyzer Operational Check list and the Approved Method To Conduct Breath Test With Breathalyzer filed by the state toxicologist with the clerk of the district court pursuant to NDCC § 39–20–07, indicate that the standard test is to be begun on the "zero line." The Approved Method states that "[a] proper result from the standard test indicates that the Breathalyzer is operating properly." The Standard Solution

Analytical Report issued by the state toxicologist on the standard ethyl alcohol solution used in the test involved here states:

"A proper result for the standard test using this solution should be in the range of 0.100% to 0.119%. Such readings are usually reported on Breathalyzer Operational Check List (Form 106) as 0.10% if the reading is between 0.100% and 0.109%, and as 0.11% if the reading is between 0.110 and 0.119%."

It is undisputed that the officer administering the Breathalyzer test to Moser began the standard test "a little bit to the left of the zero line" and the result of the standard test was a reading a little bit to the left of the 0.12% mark.

Subsection 5 of NDCC § 39–20–07 provides, in part:

"The results of the chemical analysis must be received in evidence when it is shown that the sample was properly obtained and if the test is shown to have been performed according to methods and with devices approved by the state toxicologist...."

■ We said in *State v. Schneider*, 270 N.W.2d 787, 791 (N.D.1978), that "[f]air administration of the breathalyzer test requires, at the minimum, a showing that the test was 'performed according to the methods and/or with devices approved by the state toxicologist....'" The foundational requirements needed to show that a Breathalyzer test was "fairly administered" so as to render the results admissible, may be met either through testimony of the state toxicologist or through the introduction of certified copies of approved methods and techniques filed by the state toxicologist with the clerk of the district court pursuant to NDCC § 39–20–07. *State v. Schneider, supra.* Absent testimony by the state toxicologist, the foundational requirement necessary to show fair administration of a breathalyzer test and admissibility of the test results is a showing that the test was administered in accordance with the approved methods filed with the clerk of the district court. Thus, reliability and accuracy of the results are

established by demonstrating compliance with the methods adopted by the state toxicologist. Because the statute permits admission of such evidence without expert witness testimony to establish accuracy and reliability, all the requirements of the statute must be scrupulously met to ensure a uniform basis of testing throughout the State and fair administration.

■ The officer's failure to start the standard test at zero violated the approved procedures on file with the clerk of the district court. Therefore, the minimum foundational requirement to show fair administration of the Breathalyzer test and admissibility of the Breathalyzer test result is absent because the test clearly was not performed according to methods approved by the state toxicologist. *State v. Schneider, supra; State v. Salhus*, 220 N.W.2d 852 (N.D.1974); NDCC § 39–20–07(5). Notwithstanding their improper foundation, the Breathalyzer test results were received into evidence over objection. We hold that the results of the Breathalyzer test were improperly admitted into evidence because of the lack of a full showing that the test was administered as required by NDCC § 39–20–07. *State v. Puhr*, 316 N.W.2d 75 (N.D.1982). While the foundational defect might have been cured through testimony of the state toxicologist, whose testimony at trial takes precedence over the approved methods filed with the district courts, *State v. Puhr, supra; State v. Guthmiller*, 350 N.W.2d 600 (N.D.1984), no such testimony was presented.

The Commissioner argues that, because the Breathalyzer test indicated that Moser's blood alcohol concentration was 0.19 percent by weight, any variance from the approved method of conducting a Breathalyzer test does not matter. This argument goes to weight, rather than to competency and admissibility. Further, there was no testimony as to whether, had the standard test been started on the zero line, the result would have exceeded 0.119%, the upper limit of the range specified in the state toxicologist's Standard Solution Analytical Report. Nor was there any testimony as to the effect of the operator's error on the accuracy of the Breathalyzer test result. We note that *State v. Salhus, supra*, held inadmissible a Breathalyzer test result of 0.22 percent.

The Commissioner has attempted to "borrow" the testimony of the state toxicologist in *State v. Guthmiller, supra*. Present in that case, however, was the state toxicologist's testimony that the "standard solution test involved tested out properly and ... if the standard test and the room air test are right on a given date, the machine is running properly." *State v. Guthmiller, supra*, 350 N.W.2d at 602. In this case, there was no such testimony that the standard test "tested out properly" and that the machine was "running properly."

### III.

In view of our holding on the second issue we need not consider Moser's final contention that he was not tested within two hours after driving as required by NDCC §§ 39–20–03.1.

■ For the reasons stated, we conclude that the admissible evidence received in the administrative hearing was "insufficient to warrant the conclusion reached by the ... hearing officer," NDCC § 39–20–06, and the district court judgment affirming the Commissioner's hearing officer's decision to suspend Moser's driving license is, therefore, reversed.

GIERKE, J., concurs.

VANDE WALLE, Justice, concurring specially.

Section 39–20–07(5), N.D.C.C., provides that upon the trial of any proceeding arising out of acts alleged to have been committed while driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor, the results of the chemical analysis must be received in evidence when it is shown that the sample was properly obtained "and if the test is shown to have been performed according to methods and with devices approved by the state toxicologist, and by an individual

possessing a certificate of qualification to administer the test issued by the state toxicologist." I agree with the majority opinion that because the Breathalyzer test was not, according to the records, started as required by the operational checklist and techniques approved by the State Toxicologist [see Section 39–20–07(6)(c), N.D.C.C.], it was not shown the test was fairly administered and it should not have been received in evidence.

The variance here is similar to one of the variances discussed in *State v. Guthmiller*, 350 N.W.2d 600 (N.D.1984), in which we upheld the conviction for driving while under the influence of intoxicating liquor because the State Toxicologist was present at the hearing to explain that the variance in administering the test would have no effect on the validity of the test results. Had the State Toxicologist been called to testify in this case, I would not expect his testimony to change from that in *Guthmiller;* but we cannot and should not speculate as to what that testimony might be in a different case. It is the burden of the State to show that the test was fairly administered. When the documents offered in evidence to fulfill that burden illustrate on their face that the procedures prescribed by the State Toxicologist have not been followed, the State should call the State Toxicologist to explain that the variance did not affect the validity of the test results if, in fact, that is the case. If the State Toxicologist had been called as a witness, we do not know what answers he might have given in response to questions put to him by counsel for Moser which would create sufficient doubt in the mind of the hearing officer to prevent the suspension of Moser's license.

We are portrayed by the dissenting opinion as splitting an evidentiary hair too finely. But unless we are to apply our own "expert opinion" to these matters, once we veer from the regulations promulgated by the State Toxicologist, we are on uncharted seas. I, for one, do not consider myself "expert" enough to determine whether unexplained variances which will come before us in future appeals involve splitting evidentiary hairs or whether they are "real" variances which should prevent the admission of the test. With all due respect to my colleagues, I must question whether or not they possess the expertise to do so.

If certain variances such as those described in *Guthmiller, supra*, and in this case do not affect the validity of the results, perhaps the check-list and the techniques approved by the State Toxicologist should so indicate. There may be some danger that the individuals possessing a certificate of qualification to administer the test may become careless if the methods and techniques approved by the State Toxicologist permit variances. If that is a danger, then tests which are not administered according to the approved methods and techniques should not be considered unless the State Toxicologist or his designee testified in person or by deposition that the variances do not affect the test results. I realize the statutes allow a limited amount of time between the arrest and the hearing. However, the statutory scheme adopted by our Legislature also indicates that only tests which are fairly administered may be received into evidence.

MESCHKE, Justice dissenting.

The message of the majority opinion and the concurrence by Justice VandeWalle is that any sloppiness in administering breathalyzer blood alcohol tests will be viewed as affecting their competency and reliability for admissibility. As a general proposition, I concur in that message. It is in keeping with the Court's traditional responsibility to determine foundation and admissibility of evidence; Rule 104(a), N.D. R.Ev.

However, the "little bit" of variance here is hairsplitting, as can be seen from the attached Exhibit from page 26 of the Appendix. The office of the State Toxicologist states in its certification on the "Standard Solution Analytical Report," Form 112, that the "ethyl alcohol in the required concentration [is] to simulate the equivalent of 0.11% blood alcohol," and further that a "proper result for the standard test

using this solution should be in *the range of 0.100% to 0.119%,"* (emphasis supplied) which approximates a permissible nine percent tolerance, plus or minus. Therefore, I do not agree that this hairline variance in marking the standard test start such a "little bit" to the left of the zero line goes to the competency or reliability of the test.

We should not use the sledge-hammer of Supreme Court decision to split an evidentiary hair this finely. A decision like this does not sufficiently respect the clear legislative policy to facilitate the use of chemical tests, without the necessity of using expensive expert testimony, to keep drunk drivers off the road. *State v. Vetsch*, 368 N.W.2d 547 (N.D.1985). A scientific result that is generally over ninety percent accurate is certainly sufficiently reliable and trustworthy for consideration as evidence. Particular variances then should generally be a matter of weight, unless they are so significant as to seriously indicate a lack of trustworthiness.

In my view, this "hairline" variance affects the weight of the test result, not its admissibility. Since the test result was 0.19%, or well over the minimum statutory concentration, I have no difficulty in concluding that the evidence was sufficient to warrant the conclusion reached by the hearing officer on this issue.

Therefore, I dissent from the holding that the test was not fairly administered and was not admissible.

ERICKSTAD, C.J., concurs.

## APPENDIX

**TEST RECORD** Korm Hill
Blank

PER CENT - BLOOD ALCOHOL

.00 .05 .10 .15 .20 .25 .30 .35 .40

*Breathalyzer* ®

SUBJECT Terry M. Moser

DATE AND TIME 09-14-84    0238

BY Ed Holzworth

**TEST RECORD** Analysis

PER CENT BLOOD ALCOHOL

.00 .05 .10 .15 .20 .25 .30 .35 .40

*Breathalyzer* ®

SUBJECT Terry M Moser

DATE AND TIME 09-14-84 0247

BY Ed Holzworth

**TEST RECORD** Standard

PER CENT BLOOD ALCOHOL

.00 .05 .10 .15 .20 .25 .30 .35 .40

*Breathalyzer* ®

SUBJECT Terry M Moser

DATE AND TIME 09-14-84 0253

BY Ed Holzworth