STATE of North Dakota, Plaintiff
and Appellee,

v.

Carl INDVIK, Defendant and Appellant.

Cr. Nos. 1081, 1082.

Supreme Court of North Dakota.

Feb. 20, 1986.

Asmundur Swain Benson III [argued], of the Benson Law Office, Bottineau, for defendant and appellant.

Lee A. Christofferson, State's Atty., Rolette County, Rolla, for plaintiff and appellee.

GIERKE, Justice.

This is an appeal by defendant, Carl Indvik, from the guilty verdicts returned by a twelve-person jury on January 25, 1985, on

two counts of reckless endangerment and one count of terrorizing. On February 6, 1985, Indvik was sentenced by the District Court of Rolette County. Indvik filed a notice of appeal on February 12, 1985. We affirm.

## FACTS

On May 25, 1984, at approximately midnight, the Rolette County sheriff's office received a report of a shot having been fired into the St. John Rectory, in the City of St. John, North Dakota. Sheriff Bryant Mueller responded to the call and investigated the shooting incident. While investigating the first incident, the sheriff received reports of two residential dwellings which were also targets of gun shots.

The sheriff interviewed the homeowners and other individuals at the crime scenes and received the names of two suspects, one of which was Indvik's. Indvik had reportedly been acting strangely earlier that evening. The other suspect resided in Belcourt, a nearby community.

The sheriff requested the assistance of two other deputies and, while awaiting their arrival, he began patrolling St. John. He also contacted Belcourt law authorities to begin inquiries as to the other suspect.

When the two deputies arrived in St. John, the three officers established various points of surveillance. Deputy Sheriff Rodney Trottier was instructed to watch an area of the town which included the Indvik home, but he was not given the name of the defendant as a suspect.

On May 26, 1984, at approximately 1 a.m. Deputy Sheriff Trottier saw someone leave the Indvik home, get into a nearby vehicle, and drive away. He notified the other officers and was instructed to follow the vehicle. The vehicle was leaving the city limits when Sheriff Mueller told Deputy Sheriff Trottier to stop it. When Deputy Trottier attempted to stop the vehicle, using the patrol car's flashing red lights, the vehicle sped away. A high-speed chase followed with three officers in pursuit. The chase ended when the driver returned to St. John and stopped his vehicle near the

Indvik home. When the driver left the vehicle, he ran behind the house. Deputy Trottier allegedly observed a weapon in the driver's hand.

Persons in the area identified the driver as Indvik. Indvik was later located lying in an overgrown area behind the house. For the next hour Indvik fended off the officers. At one point, when Deputy Trottier was within three feet of Indvik, Indvik drew a gun.

Indvik was finally disarmed and arrested. Later, a search warrant was issued for Indvik's home and vehicle.

Following the arrest, the county court ordered Indvik to be transported to the State Hospital in Jamestown for a psychological evaluation. A preliminary hearing was held in Rolette County Court on July 23, 1984, at which time Indvik was bound over to district court on five charges: three counts of reckless endangerment and two counts of terrorizing.

The evaluation determined that Indvik was competent to stand trial, was able to assist in his own defense, and was not suffering from any mental disease or defect at the time of the alleged shootings on May 25, 1984.

On August 29, 1984, Indvik filed his notice of intent to rely on the defense of lack of criminal responsibility by reason of mental disease or defect, pursuant to Rule 12.2 of the North Dakota Rules of Criminal Procedure. Based upon Indvik's motion for evaluation, which was filed on November 8, 1984, the court ordered a psychological evaluation. The evaluation was to be conducted on December 13, 1984, by a psychiatrist in Fargo, precisely as Indvik had requested.

Early in December, Indvik ceased to communicate with his court-appointed attorney, despite several attempts by the attorney to get in touch with him. Indvik had contacted an attorney in Grand Forks and was apparently harboring the incorrect belief that the Grand Forks attorney had taken over his representation. However, the district court had issued a letter denying the

request for change of counsel. In the interim, Indvik missed the evaluation in Fargo and, consequently, a bench warrant was issued.

On December 20, 1984, the trial court quashed the application for an independent psychological evaluation and ordered Indvik's commitment to the State Hospital for a period of not to exceed thirty days for examination, evaluation, and determination of Indvik's capacity to stand trial and his capacity to appreciate the criminality of his conduct.

Following this evaluation, the State Hospital issued a second report, again finding that Indvik was competent to stand trial and did not suffer from mental disease at the time of the alleged incidents.

On January 21, 1985, a jury trial began which ran for five days. The trial resulted in judgments of conviction against Indvik for three of the five felony counts.

### ISSUES

Indvik presents this court with three issues on appeal:

1. Whether or not the psychological evaluations conducted at the State Hospital were sufficient examinations to determine that Indvik did not suffer from a mental disease or defect, pursuant to § 12.1-04-03, N.D. C.C.[1]

2. Whether or not there was probable cause for the arrest of Indvik on May 26, 1984.

3. Whether or not the trial court erred in admitting into evidence the firearm taken from Indvik following his arrest.[2]

### I.

The first issue is whether or not the psychological evaluations conducted at the State Hospital were sufficient examinations to determine that Indvik did not suffer from a mental disease or defect which relieved him of responsibility for his criminal conduct pursuant to § 12.1-04-03, N.D. C.C. Indvik asserts on appeal that the examinations he received were not sufficient because they were not "independent" psychological evaluations.

In June 1984 Indvik had an initial and thorough examination, as requested by the county court, to determine his competency to stand trial. This evaluation was conducted by A.A. Corral, M.D., a licensed psychiatrist. Dr. Corral found Indvik competent. Indvik then filed a notice of his intent to rely on the defense of mental disease or defect pursuant to § 12.1-04-03, N.D.C.C. He also made a motion for a psychological evaluation to be conducted by a psychiatrist practicing in Fargo, North Dakota. The district court approved Indvik's request for the evaluation, allocated $1,000 to cover the cost, and the initial appointment was scheduled for December 13, 1984. Indvik did not show up for this appointment.

■ The district court then ordered a psychological evaluation be conducted by the State Hospital to determine Indvik's competency to stand trial and to determine whether Indvik was responsible for his alleged criminal conduct. Dr. R. Naranja, a board-certified psychiatrist, undertook the supervision of the second evaluation, and weighed the observations of Dr. Joseph B. Sutter, a staff psychologist, as well as the observations of an around-the-clock nursing staff. He concluded that Indvik was not suffering from a specific mental disease or defect and that Indvik had substantial capacity to appreciate the criminality of his conduct. We turn now to the claim that these examinations were not sufficient, as

---

1. In 1985 the Senate repealed § 12.1-04-03, N.D.C.C. However, this action commenced before the statute was repealed.

   The Legislature has enacted the Uniform Criminal Responsibility and Post-Trial Disposition Act. *See* § 12.1-04.1-01 et seq., N.D.C.C.

2. An issue raised in the briefs of appellant concerning the validity of the arrest because of its occurrence on trust land was conceded by counsel at oral argument based on fresh pursuit ordinances. *See* Turtle Mountain Tribal Code of 1976, § 1.0712.

they were not "independent". For several reasons we reject this argument.

The record does not support this argument. Indvik argues that, since the State Hospital is a state agency, "there may exist the potential for conflict when dealing with alleged criminals". The record does not reveal any such conflicts. Rather, it includes a series of examination procedures and reports from two licensed psychiatrists. There are no inconsistencies nor is there any indication of a less than professional and conflict-free determination of Indvik's mental competency.

Indvik does not offer any specific example of actual or potential conflict which could arise by the use of the State Hospital staff for evaluations. He simply states the potential exists. The State Hospital staff designated by the district court to evaluate Indvik is not an advocate of the prosecution, though the fee is paid by the State, any more than is court-appointed counsel for the defense beholden to the prosecution merely because counsel is, as here, compensated by the State. *See, McGarty v. O'Brien*, 188 F.2d 151, 155 (1st Cir.1951). The doctors who evaluated Indvik are not advocates for the prosecution and Indvik has not shown that any conflict exists.

Indvik does not define "independent". It was mentioned at oral argument on appeal that these psychiatrists had been called as prosecution witnesses and were therefore biased and not "independent". We would note, however, that had their reports been favorable to Indvik, he could have called them as defense witnesses. Also to be noted, Indvik had sufficient time prior to trial to examine these reports and at trial to cross-examine each psychiatrist as to the preparation of the reports and the resulting diagnoses.

Indvik directs us to a recent decision, *Ake v. Oklahoma*, 470 U.S. ——, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Ake was tried for two counts of murder in the first degree, a crime punishable by death in Oklahoma, and for two counts of shooting with intent to kill. His sole defense was insanity. There was no expert testimony for either side on Ake's sanity at the time the offense was committed. The jurors were instructed that Ake could be found not guilty by reason of insanity if he did not have the ability to distinguish right from wrong at the time of the commission of the offense. They were also told that Ake was to be presumed sane at the time the crime was committed unless he presented evidence sufficient to raise a reasonable doubt about his sanity at the time. The jury found Ake guilty and sentenced him to the death penalty on each of the two murder counts, and to 500 years' imprisonment on each of the two counts of shooting with intent to kill. The court held that:

> "We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. ... we leave to the States the decision on how to implement this right." *Ake, supra*, 470 U.S. at ——, 105 S.Ct. at 1097, 84 L.Ed.2d at 66.

In the instant case Indvik was not denied access to a competent psychiatrist. He saw two psychiatrists and, had they reported that he was not mentally competent, he would have had the benefit of their testimony as expert witnesses for the defense. Contrarily, Ake had no psychiatric testimony to present at trial as to the issue of his mental competence at the time the criminal conduct occurred. From the circumstances of this case we conclude that the State Hospital staff conducted a sufficient examination to satisfy the requirements of *Ake* and to have safeguarded the rights of Indvik.

## II.

The second issue is whether or not there was probable cause to justify the arrest of

Indvik. The resolution of this issue requires a two-pronged analysis. *See, State v. Arntz,* 286 N.W.2d 478, 479 (N.D.1979). The first prong is whether or not the initial stop was justified. The second prong is whether or not the warrantless arrest was justified.

We first address whether or not the initial stop was justified. It must be determined at what point in the present factual situation the stop took place. We conclude that the "stop" took place when Deputy Trottier used his flashing red lights to alert Indvik to stop his vehicle. This conclusion rests on several premises.

■ A traffic stop significantly curtails the "freedom of action" of the driver and the passengers, if any, of the detained vehicle. *Berkemer v. McCarty,* 468 U.S. 420, ——, 104 S.Ct. 3138, 3149-50, 82 L.Ed.2d 317, 333 (1984). A "stop" is a temporary restraint of a person's freedom. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). When a police officer turns on his flashing red lights it constitutes the first step in the "stop" and the driver must make a decision. Few motorists can ignore or disobey a directive to pull over. *Id.* 468 U.S. at ——, 104 S.Ct. at 3148-49, 82 L.Ed.2d at 332. There is no choice, for to choose not to stop is to have committed a crime. Indvik chose to ignore the flashing red lights and, in so doing, committed a crime under North Dakota law. § 12.1-08-02, N.D.C.C. This is not to say that each time an officer turns on his flashing red lights, a "stop" has occurred. There may be several motorists in the vicinity of an officer when he uses his flashing red lights. To constitute a stop by the use of flashing red lights, the officer must have the intent to stop the specific motorist and the motorist must be cognizant of the officer's presence. *See People v. Shabaz,* 424 Mich. 42, 378 N.W.2d 451 (1985). The "stop" in the present case is analogous to the "*Terry* stop" and, therefore, must be analyzed under the appropriate test. *See Terry v. Ohio, supra.*

We embrace the standard test, that an officer must have an articulable basis or reasonable suspicion for stopping a vehicle for investigation. *State v. Dorendorf,* 359 N.W.2d 115 (N.D.1984); *Terry v. Ohio, supra.* An investigating officer may draw inferences and make deductions which would elude a layperson. *U.S. v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The standard is an objective one. The question is whether or not a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged in criminal activity. *Cortez, supra* 449 U.S. at 417, 101 S.Ct. at 694-95.

■ There was not the requisite reasonable suspicion to justify a "stop" of Indvik's vehicle. The record indicates that Sheriff Mueller had been told that Indvik had acted strangely earlier that evening. From this information the sheriff apparently determined that Indvik was a suspect in the shooting incident. This led the sheriff to place Indvik's home under surveillance. At some point the sheriff also found out that Indvik had "access to guns". This information does not support a finding that the stop was supported by reasonable suspicion. Indvik's actions are merely innocent-seeming activities that contain "no suggestion of criminal activity by itself" [*Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)].

We conclude that there was not sufficient justification to support the "stop" of Indvik under the first prong of the *Arntz* analysis; and our inquiry might have ended there but for Indvik's subsequent actions.

■ Indvik's independent and intervening actions of engaging the officer in a high-speed chase, running from the police officers into the woods, drawing a firearm on the police officers—and actually firing it—break the chain of causation and dissipate the taint of the prior illegality, *i.e.,* the invalid stop. *Com. v. King,* 389 Mass. 233,

449 N.E.2d 1217 (1983). Indvik's independent and intervening actions subsequent to the officer's attempt to stop Indvik certainly created probable cause for his arrest on the charge of terrorizing. § 12.1–17–04, N.D.C.C. Furthermore, his action of carrying a loaded firearm made it reasonable for the. officers to conclude that Indvik could have been the perpetrator of the earlier gun-shooting incidents.

The second prong of the analysis is whether or not the warrantless arrest was justified. An arrest without a warrant is valid when a law enforcement officer has probable cause to believe that the arrested person committed a felony. § 29–06–15(1–6), N.D.C.C.; *State v. Lind*, 322 N.W.2d 826, 833 (1982). Probable cause to support a warrantless arrest "exists when the facts and circumstances within a police officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in believing that an offense has been or is being committed". *Lind, supra.* The police officers had probable cause to effectuate a warrantless arrest under § 29–06–15(1–6), N.D.C.C. The warrantless arrest is valid.

### III.

The next issue is whether or not the trial court erred in admitting into evidence the firearm taken from Indvik following his arrest. Indvik asserts that the firearm should be inadmissible as fruit of the poisonous tree. We note that had the firearm been taken from Indvik following an illegal stop it would have been inadmissible. However, Indvik's independent and intervening actions dissipated the taint and the firearm is admissible.

The order of the district court is affirmed.

ERICKSTAD, C.J., and VANDE WALLE, LEVINE and MESCHKE, JJ., concur.