**Jeffrey B. SCHWIND, Petitioner and Appellee,**

v.

**DIRECTOR, NORTH DAKOTA DEPARTMENT OF TRANSPORTATION, Respondent and Appellant.**

**Civ. No. 900133.**

Supreme Court of North Dakota.

Oct. 31, 1990.

Elaine Ayers, Asst. Atty. Gen., Bismarck, for respondent and appellant.

James A. Wright of Weiss, Wright, Paulson & Merrick, Jamestown, for petitioner and appellee; appearance by Cynthia Schaar–Macklenberg.

VANDE WALLE, Justice.

This is an appeal by the Director of the North Dakota Department of Transportation from a district court judgment reversing the administrative hearing officer's decision to suspend Jeffrey B. Schwind's driving privileges for 91 days. We reverse.

On September 30, 1989, Stutsman County Sheriff's Deputy Richard Griffin stopped a vehicle, driven by Schwind, for failure to observe a stop sign. Deputy Griffin approached the vehicle. He detected the odor of alcohol on Schwind's breath and observed that Schwind had bloodshot eyes. Schwind admitted to Deputy Griffin that he had been drinking.

At Deputy Griffin's request, Schwind performed several field-sobriety tests. Deputy Griffin concluded that Schwind was under the influence of alcohol, placed him under arrest and transported him to the emergency room at the Jamestown Hospital for a blood test.

While at the hospital, a registered nurse collected the blood specimen from Schwind, in accordance with State Toxicologist form 104. Form 104 provides a checklist of instructions to be completed by the blood-specimen collector. In the instant case, the nurse did not check the box on the front of form 104 which indicates whether or not the container seal on the blood kit canister was intact before use. Deputy Griffin did initial the box and testified that the canister was sealed prior to use by the nurse. The instructions on form 104 were complied with in all other respects.

As required by chapter 39–20, NDCC, Deputy Griffin mailed a written report and notice to the Director within five days of issuing Schwind a temporary operator's permit. Deputy Griffin did not indicate on the report and notice whether or not

Schwind's driving license was attached. The record does not indicate whether Deputy Griffin ever sent the license to the Director as he was directed to do under section 39–20–03.1, NDCC.

Schwind contended that the lack of evidence of compliance with section 39–20–03.1, NDCC, was fatal to the Director's jurisdiction to conduct a hearing and that deviation from procedures prescribed by the State Toxicologist invalidated the blood test. The hearing officer did not agree; he held that the possible failure of Deputy Griffin to submit the license was a non-issue and that despite the nurse's failure to complete Form 104 correctly, the test was completed properly.

The district court reversed the decision of the hearing officer, concluding that the two procedural defects raised "a question about the jurisdiction of the Department to hear the matter and also the foundational requirements for the admission of the test result in this matter were not properly shown."

The Director raises two issues on appeal.

I. Whether the lack of evidence that Schwind's driver's license was sent to the Director is fatal to the Director's jurisdiction to conduct an administrative hearing.

II. Whether the evidence proved that the State Toxicologist's directions for sample collection were followed and assured the accuracy and reliability of the blood tests.

■ The Administrative Agencies Practice Act, chapter 28–32, NDCC, governs an appeal from a district court judgment involving a license suspension under section 39–20–05, NDCC. *Greaves v. North Dakota State Highway Comm'r*, 432 N.W.2d 879 (N.D.1988). We, therefore, look to the record of the administrative agency, rather than the findings of the district court. *Id.*

"Our role in reviewing the factual basis of an administrative decision is limited to a consideration of the following questions: '(1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law?' *Asbridge, supra.* [*Asbridge v. North Dakota State Highway Commissioner*, 291 N.W.2d 739 (N.D.1980).] This Court also considers whether the decision violates constitutional rights or is not in accordance with the law. *See* § 28–32–19, N.D.C.C. We exercise restraint in reviewing the findings of an administrative agency; we do not substitute our judgment for that of the agency. [Citation omitted.]" *Dodds v. North Dakota State Highway Comm'r*, 354 N.W.2d 165, 168 (N.D. 1984).

I.

Section 39–20–03.1, NDCC, provides in part:

"If a person submits to a test under section 39–20–01, 39–20–02, or 39–20–03 and the test shows that person to have a blood alcohol concentration of at least ten one-hundredths of one percent by weight at the time of the performance of a chemical test within two hours after the driving or being in actual physical control of a vehicle, the following procedures apply:

"1. The law enforcement officer shall immediately take possession of the person's operator's license *if it is then available* and shall immediately issue to that person a temporary operator's permit if the person then has valid operating privileges.... [Emphasis added.]

. . . . .

"3. The law enforcement officer, within five days of the issuance of the temporary operator's permit, shall forward to the commissioner a certified written report in the form required by the commissioner and the person's operator's license taken under subsection 1 or 2.... In addition to the operator's license and report, the law enforcement officer shall forward to the commissioner a certified copy of the operational checklist and test records of a breath test and a copy of the certified

copy of the analytical report for a blood, saliva, or urine test for all tests administered at the direction of the officer."

■ The Director asserts that the language regarding forwarding of the operator's license to the Director is not jurisdictional. We agree.

■ A public administrative body has such adjudicatory jurisdiction as is conferred on it by statute. *Springville Community School Dist. v. Iowa Dep't of Pub. Instruction*, 252 Iowa 907, 109 N.W.2d 213, 217 (Iowa 1961). The jurisdiction of an administrative agency is dependent upon the terms of the statute and must meet at least the basic mandatory provisions of the statute before jurisdiction is established. 2 Am.Jur.2d *Administrative Law* § 328 (1962).

While the jurisdiction of an administrative agency is dependent upon the terms of a statute, these terms must be construed logically so as not to produce an absurd result. *Fireman's Fund Mortgage Corp. v. Smith*, 436 N.W.2d 246 (N.D.1989). Where adherence to the letter of the law would result in an absurdity, we have noted that "[e]ffect will be given the real intention even though contrary to the letter of the law." *Perry v. Erling*, 132 N.W.2d 889, 896 (N.D.1965) [quoting 82 C.J.S. *Statutes* § 325 (1953)].

The clear legislative intent in enacting chapter 39–20, NDCC, was for the protection of the public, *i.è.*, to prevent individuals from driving while under the influence of intoxicants. *Williams v. North Dakota State Highway Comm'r*, 417 N.W.2d 359, 360 (N.D.1987); *Asbridge v. North Dakota State Highway Comm'r*, 291 N.W.2d 739, 750 (N.D.1980). Section 39–20–03.1, NDCC, was enacted, in part, to help ensure that an individual who violated this chapter would not continue to drive. It would be an absurd result if we were to hold that an officer's failure to strictly comply with this portion of the statute had the opposite effect. While it is clear that section 39–20–03.1, NDCC, requires the officer to forward the operator's license, the failure to do so does not destroy the Director's jurisdiction

to suspend a violator's driving privileges. A contrary holding would defeat the Legislature's intent to protect the public from potential hazards posed by intoxicated drivers.

At oral argument, counsel for Schwind asserted for the first time that Section 39–20–04.1, NDCC, supported Schwind's contention that the Director's jurisdiction was dependent upon receiving the operator's licenses. Section 39–20–04.1, NDCC, provides, in part:

"1. After the receipt of a person's operator's license, *if taken* under section 39–20–03.1 or 39–20–03.2, and the certified report of a law enforcement officer and if no written request for hearing has been received from the arrested person under section 39–20–05, or if that hearing is requested and the findings, conclusions, and decision from the hearing confirm that the law enforcement officer had reasonable grounds to arrest the person and test results show that the arrested person was driving or in physical control of a vehicle while having a blood alcohol concentration of at least ten one-hundredths of one percent by weight at the time of the performance of a test within two hours after driving or being in physical control of a motor vehicle, the commissioner shall suspend the person's operator's license...." [Emphasis added.]

Consideration of this statute does not alter the analysis of this case.

The language in section 39–20–04.1 is consistent with the language in section 39–20–03.1. Both sections condition the requirement that the Director possess the license by allowing for situations wherein the license was not taken from the operator. A review of the legislative history of section 39–20–03.1 reveals that the language "if it is then available" was added to that section in 1989 to eliminate any question of whether proper procedure under chapter 39–20 was followed in cases where the officer could not take possession of the license. *See* testimony of Al Spier, January 16, 1989, Minutes of Judicial Committee of Senate regarding Senate Bill 2238. Sec-

tion 39–20–04.1, like the rest of chapter 39–20, was enacted as a protective measure, and should not be construed so as to abrogate that protection.

The construction of sections 39–20–03.1 and 39–20–04.1 adopted by the Court today is consistent with other license suspension provisions contained within Title 39 of the Code.[1] Schwind had full notice and knowledge of the administrative proceedings and has not been shown to have been prejudiced by the alleged failure to submit the license.

The prerequisite for the exercise of the Director's jurisdiction is the certified written report and test records of either breath, blood, saliva, or urine. Because these were forwarded as required by statute, we hold that the Director's jurisdiction was properly exercised.

## II.

■ The Director next asserts that even though the nurse did not check the box on form 104 regarding whether the blood kit canister seal was intact, the evidence proved the State Toxicologist's directions were complied with sufficiently to assure the accuracy and reliability of the blood test. We agree.

The back of form 104 contains the State Toxicologist's directions for sample collection and submission of blood specimens. The directions read as follows:

### "FOR BLOOD OR OTHER FLUID SPECIMENS

"1. Use a sterile, dry, clean syringe and needle, and non-alcoholic, non-volatile, skin disinfectant.

"2. Remove stopper from vial before filling. These vials do not have a vacuum.

"3. If possible place 10 ml of whole blood or other fluid specimen into the vial and replace the stopper.

"4. Invert the vial several times to mix the chemical and prevent clotting.

"5. Fill in name of subject, date, time and your name or initials on the label. Place it over the top and down the sides of the vial.

"6. Fill in the top part of this form and place it and the sealed vial in the mailing container.

"7. Place cotton or tissue paper on top of the vial. Replace the metal screw cap.

"8. Affix the mailing container seal by placing it over the metal cap and down the cardboard sides.

"9. Affix the return address label around the mailing container over the ends of the seal."

"The specimen containers for urine and blood contain sodium azide, and sodium fluoride & potassium oxalate, respectively. These chemicals are poisonous and care should be taken in handling the vial."

These directions comprise two components. The first component directs the procedure for collecting and preserving the blood sample and ensures the scientific accuracy and reliability of the test. *State v. Schwalk*, 430 N.W.2d 317 (N.D.1988). The second component directs the submission of the sample to the State Toxicologist and provides an "evidentiary shortcut for establishing chain of custody." *Id.*

The front of form 104 has a section to be filled in by the blood-specimen collector. This section asks the collector to certify that the container seal was intact, a sterile, dry, clean syringe and needle were used, and a non-alcoholic, non-volatile skin disinfectant were used. This certification covers the first step in the nine-step Toxicologist's directions. *Id.*

■ Schwind asserts deviation in the sample collection/scientific-accuracy component. When the State fails to establish compliance with the Toxicologist's directions which go to the scientific accuracy of the test, the State must prove fair administration of the test through expert testimony. *Id.; Moser v. North Dakota Highway Comm'r*, 369 N.W.2d 650 (N.D.1985).

---

1. See section 39–05–27, NDCC [Director may suspend license upon notice of conviction, suspension or revocation in another state]; section 39–06–33, NDCC [Director may suspend license upon notice and opportunity for hearing for entries against driving record].

The instant case is distinguishable from *Schwalk* and *Moser*. Both of those cases involved deviations from the Toxicologist's directions which affected the scientific accuracy of the sample. We concluded that if the directions were not complied with, expert testimony establishing the scientific accuracy of the test was necessary in order that the test results be admissible into evidence. Contrary to *Schwalk* and *Moser*, expert testimony is not necessary to assure the scientific accuracy of this sample.

The only "deviation" from the Toxicologist's directions on form 104 was that the nurse did not check the box indicating whether the container seal on the blood kit canister was intact before use. She did sign the certification that the information in that section was true and correct. We do not know why Deputy Griffin, rather than the nurse, inspected the seal. Nevertheless, Deputy Griffin testified that he inspected the seal, found it to be intact, and initialed form 104 so as to certify that fact. The fact that the deputy, rather than the nurse, initialed the box indicating the seal to be intact does not lessen the reliability of the certification. It does not require any special scientific or medical training to determine if a seal is intact. We have never held that expert testimony is necessary to explain what is readily observable to the ordinary person.

The deviation from the Toxicologist's directions could not have substantially affected test results. *See Heinrich v. North Dakota State Highway Comm'r*, 449 N.W.2d 587 (N.D.1989) [officer's post-test correction of standard solution number could not have affected accuracy and reliability of intoxilyzer test results]; *Schense v. Hjelle*, 386 N.W.2d 888 (N.D.1986) [discrepancy in serial numbers identifying simulator could not have affected test results]. Therefore, we reverse the district court judgment and affirm the Director's decision.

ERICKSTAD, C.J., and GIERKE, MESCHKE and LEVINE, JJ., concur.