Richard BRYL, Petitioner
and Appellant,

v.

Richard BACKES, Director, North Dakota Department of Transportation, Respondent and Appellee.

Civ. No. 910139

Supreme Court of North Dakota.

Nov. 12, 1991.

Frith Law Office, Devils Lake, for petitioner and appellant; argued by Todd A. Schwarz.

Gregory B. Gullickson, Asst. Atty. Gen., Bismarck, for respondent and appellee.

ERICKSTAD, Chief Justice.

Richard Bryl appeals from the judgment of the District Court for Ramsey County, affirming an administrative suspension of Bryl's driver's license. We affirm.

On January 2, 1991, Richard Bryl was arrested for driving under the influence of alcohol and driving while his operator's license was under suspension. Prior to the arrest, an attendant at the Super Pumper convenience store in the city of Devils Lake had called the police station and said that an intoxicated man had come into the store twice, was now sitting in a pickup in the parking lot, and had been there for over twenty minutes.[1] This information was relayed by police radio to Devils Lake City Patrolman David Fix who drove his patrol car to the convenience store, arriving approximately two minutes later.

Upon reaching the store, Officer Fix saw that there were two vehicles in the parking lot. He testified that he recognized the one as belonging to the store attendant and that the other was a pickup which proceeded to leave, as he turned his vehicle into the parking lot. Officer Fix testified that he followed the pickup in his vehicle and activated the flashing red lights within the first block. Upon completing the stop, Officer Fix approached the pickup and noticed that the driver, Richard Bryl, had bloodshot eyes, dilated pupils, and smelled of alcohol. After administering field sobriety tests, which Bryl failed, Officer Fix arrested Bryl after he determined Bryl to be under the influence of alcohol.

At the law enforcement center, Bryl was given the implied consent advisory and asked to submit to the Intoxilyzer test. Bryl agreed to take the test and the test was commenced. However, at the time of arrest, Bryl had placed some chewing tobacco or snoose in his mouth. At the law enforcement center, Bryl was asked to rinse his mouth to remove the tobacco on two occasions prior to being asked to blow into the mouth piece of the Intoxilyzer. The Intoxilyzer test was administered approximately 35 to 40 minutes after Bryl was asked to remove the tobacco by rinsing out his mouth with water. However, Bryl maintains that he kept a small amount of the tobacco in his mouth at the time the Intoxilyzer test was administered.

Because Bryl's blood alcohol level was determined by Intoxilyzer test to be in excess of .10 percent, he was given notice of the Department of Transportation's intention to suspend his driver's license. The test disclosed .22 percent alcohol by weight in his blood. Bryl thereafter requested an administrative hearing, pursuant to section 39–20–05, N.D.C.C. At the administrative hearing, Bryl argued that the arresting officer did not have reasonable suspicion to stop his vehicle and that the approved methods for conducting the Intoxilyzer test

---

1. Criminal case numbers 910132 and 910133 are the companion cases to this case involving the criminal charges of DUI and driving while under suspension. We note that the records in those cases were more fully developed with much more detail as to the facts. It is apparent that Bryl was in a very intoxicated state on the date of his arrest.

were not followed. The Department of Transportation rejected Bryl's arguments and suspended his driving privileges for two years. Bryl then appealed the administrative decision to the district court which affirmed the agency's decision. This appeal followed.

When reviewing a license suspension decision under section 39–20–05, N.D.C.C., we review the decision of the agency and not that of the district court. *Schwind v. Director, Department of Transportation,* 462 N.W.2d 147, 149 (N.D.1990). We limit our review to the record before the Department of Transportation and do not consider the findings of the district court. *Id.* All facts related herein are from the transcript of the proceedings before the hearing officer of the Department of Transportation.

Sections 28–32–21 and 28–32–19, N.D.C.C., set forth the procedure and scope of this Court's review of license suspension decisions or orders. We are required to affirm the decision or order of the Department of Transportation, unless one of the six enumerated reasons listed in section 28–32–19, N.D.C.C., is found. *See Asbridge v. North Dakota State Highway Commissioner,* 291 N.W.2d 739, 743 (N.D.1980).

Our review essentially involves a three-step process: (1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law? *Id.* Furthermore, when reviewing the factual findings of an administrative agency "we do not make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the fac-

tual conclusions reached were proved by the weight of the evidence from the entire record." *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214, 220 (N.D.1979).

Pursuant to section 39–20–05(2), N.D.C.C., the license suspension hearing in this case was limited to inquiring "whether the arresting officer had reasonable grounds to believe the person had been driving or was in actual physical control of a vehicle in violation of section 39–08–01 or equivalent ordinance; whether the person was placed under arrest; whether the person was tested in accordance with section 39–20–01 or 39–20–03 and, if applicable, section 39–20–02; and whether the test results show the person had a blood alcohol concentration of at least ten one-hundredths of one percent by weight."

Bryl first argues that the arresting officer did not have reasonable suspicion to stop his vehicle.

In order to legally make an investigative stop of an automobile, an officer must have articulable reasonable suspicion that some law has been or is being violated.[2] *State v. Neis,* 469 N.W.2d 568, 569 (N.D.1991). "The standard is an objective one. The question is whether or not a reasonable person in the officer's position would be justified by some objective manifestation to suspect the [driver] was, or was about to be, engaged in criminal activity." *State v. Neis,* 469 N.W.2d at 569 (quoting *State v. Indvik,* 382 N.W.2d 623, 627 (N.D.1986)). "The factual basis for the stop need not be the officer's personal observations alone, but may arise from information furnished by other persons." *Wibben v. North Dakota State Highway Commissioner,* 413 N.W.2d 329, 331 (N.D.1987); *State v. Lykken,* 406 N.W.2d 664 (N.D.1987). We have previously noted that an informant's tip combined with the offi-

---

2. Under the reasonable suspicion standard, the "suspicion must be 'articulable and reasonable.' The articulable aspect requires that the stop be justified with more than just a vague 'hunch' or other non-objective facts; and the reasonable aspect means that the articulable facts must produce, by reasonable inference, a *reasonable* suspicion of unlawful conduct." *State v. VandeHoven,* 388 N.W.2d 857, 858 n. 1 (N.D.1986). In

essence, "the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981).

cer's own personal observations can give rise to the articulable reasonable suspicion necessary for an investigative stop. *State v. Lange*, 255 N.W.2d 59 (N.D.1977). To be part of the factual basis giving rise to articulable reasonable suspicion, information obtained through an informant must have sufficient *indicia of reliability* and give some basis indicating possible criminal activity. *State v. Neis*, 469 N.W.2d at 569; *Wibben v. North Dakota State Highway Commissioner*, 413 N.W.2d at 331, 332. *See also Illinois v. Gates*, 462 U.S. 213, 233, 234, 103 S.Ct. 2317, 2329–30, 76 L.Ed.2d 527 (1983).

Bryl argues that the information supplied by the informant in this case was not sufficiently reliable and did not give any basis for identifying criminal activity.[3] In support of his arguments, Bryl relies in part on *City of Minot v. Nelson*, 462 N.W.2d 460 (N.D.1990). In *Nelson*, a completely anonymous informant "indicated that there was a car running in front of a trailer and that the person was suspicious because the car didn't belong there." *Id.* at 461. In holding the stop invalid we said:

> "In the record before us there is a complete lack of even the most minimal indicia of reliability of either the informant or of the information for the anonymous tip and the information received from the anonymous informant gives absolutely no indication of the basis for identifying possible criminal activity."

*Id.* at 462. We further noted in *Nelson* that the officer in that case was unable to verify any of the details of the tip. *Id.*

In this case, the informant called the law enforcement center at 2:23 a.m. and said that there was an intoxicated man sitting in a pickup truck in the parking lot of the convenience store where she was working. Officer Fix arrived at the convenience store approximately two minutes after the informant's call was made. Upon arriving, Officer Fix noted only two vehicles in the store parking lot, one of which he recognized as belonging to the store attendant. Given the slight lapse of time between the tip and Officer Fix's arrival at the convenience store, the fact that it was 2:25 a.m., and the fact that there were only two vehicles in the parking lot, one of which he recognized, Officer Fix was able to personally verify some of the details of the tip. In *Nelson*, the officer was not able to verify any of the details of the tip as the described vehicle was no longer at the reported location when the officer arrived at the scene. Furthermore, in this case, it was not unreasonable for the officer to assume that the informant who called the police was the attendant whom he knew. In *Nelson*, the informant was a truly anonymous informant. Lastly, in this case, unlike in *Nelson*, the informant did more than merely assert that there was a car parked under suspicious circumstances. In this case, the informant said that there was an intoxicated person sitting in a pickup in the parking lot of the convenience store. In other words, there were articulable facts contained within the tip which gave some basis for identifying possible future criminal activity which could result if the intoxicated person were to drive the motor vehicle.[4]

■ In *State v. Lange*, 255 N.W.2d at 63, we noted that an officer "who has been alerted to a possible DWI suspect and who observes the vehicle wandering in its lane of traffic need [not] wait for the driver to commit a traffic offense or become involved in an accident before he has proba-

---

3. We note that, in this case, the inquiry into whether or not there was any basis for identifying possible criminal activity, in a sense, parallels the inquiry into whether or not Officer Fix's suspicions were sufficiently particularized. Given the short lapse of time between the tip and Officer Fix's arrival at the store, and the fact that there were only two vehicles in the parking lot, one of which Officer Fix recognized as belonging to the store attendant, the reasonable suspicions aroused were particularized to the one vehicle.

4. As we noted in *Wibben*, "[o]rdinary citizens, like ordinary witnesses ... generally do not provide extensive recitations of the basis of their everyday observations." *Wibben*, 413 N.W.2d at 332 (quoting *Illinois v. Gates*, 462 U.S. 213, 237, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983)). Thus, we conclude that the store attendant's statement, in this case, that a person appeared "intoxicated," sufficiently describes an objective fact, unlike the statement in *Nelson* that a vehicle appeared "suspicious."

ble cause to stop the vehicle." Actually, probable cause to stop (an articulable reasonable suspicion) is less than probable cause to arrest. Although, in this case, Officer Fix observed little driving before initiating the stop, with the information he had from the informant, he had sufficient cause to stop the vehicle.[5] An officer who has articulable facts giving him or her reasonable suspicion of drunk driving need not wait for his or her reasonable beliefs to be verified through an accident.

■ In *Wibben*, we noted that "[i]n assessing whether the circumstances warranted an investigative stop, we also consider whether the state's interest in investigating the officer's reasonable suspicion outweighs the person's Fourth Amendment interests." *Wibben v. North Dakota State Highway Commissioner*, 413 N.W.2d at 332 (citing *United States v. Hensley*, 469 U.S. 221, 228, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985)). The state's interest in removing drunk drivers from our highways, and consequently reducing deaths and injuries on our highways, is a very important public interest. We conclude that "[t]he law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes." *United States v. Hensley*, 469 U.S. at 229, 105 S.Ct. at 680.

Because Officer Fix was able to personally verify some of the details of the tip through his own observations, we conclude that the information had sufficient indicia of reliability to give rise to articulable facts leading to reasonable suspicion. We further conclude that the state's interest in verifying Officer Fix's reasonable suspicions outweighs Bryl's privacy interests in being free from an investigative stop.

■ Bryl also argues that the State Toxicologist's approved methods for admin-

istering the Intoxilyzer test were not followed. Specifically, Bryl argues that under the approved methods, the chemical test operator "must ascertain that the subject had nothing to eat, drink, or smoke within twenty minutes prior to the collection of the breath sample." Bryl maintains, and the administrative hearing found as a matter of fact, that Bryl kept a small amount of tobacco in his mouth during the testing procedure.

The majority of this Court has consistently held that, "[a]bsent testimony by the state toxicologist, the foundational requirement necessary to show fair administration of a breathalyzer test and admissibility of the test results is a showing that the test was administered in accordance with the approved methods filed with the clerk of the district court," pursuant to section 39–20–07, N.D.C.C. *Moser v. North Dakota State Highway Commissioner*, 369 N.W.2d 650, 653 (N.D.1985). Without strict compliance with the approved methods, the scientific accuracy of the test cannot be established absent expert testimony. *Glaspey v. Backes*, 462 N.W.2d 635, 636 (N.D.1990).

In this case, the administrative hearing officer, Mary Ellen Varvel, determined that the Intoxilyzer testing was done in accordance with the approved methods. Varvel concluded that, although Bryl hid a small amount of tobacco or "snoose" in his mouth throughout the Intoxilyzer testing, he did not "eat or drink or smoke this." Varvel further determined as a conclusion of law that a "small amount of snoose does not affect the validity of the Intoxilyzer test." For the reasons hereinafter stated, we need not find that the record sustains this finding and these conclusions.

■ In this case, it is apparent from the record that Bryl deliberately attempted to distort the Intoxilyzer test by keeping to-

---

**5.** At the suspension hearing, Officer Fix testified that he observed some weaving within the lane, but that he was initiating the stop at the time. Because "[w]hen a police officer turns on his flashing red lights it constitutes the first step in the 'stop'," the weaving Officer Fix observed after initiating the stop is not relevant in deter-

mining whether or not there was articulable reasonable suspicion to make the stop. *State v. Indvik*, 382 N.W.2d 623, 627 (N.D.1986). For once the lights come on, the person has "no choice, for to choose not to stop is to have committed a crime." *Id.*

bacco in his mouth. Recognizing this, Bryl seems to concede that his actions could possibly be deemed a refusal to take the test, but he argues that some sort of prophylactic measure should be required by this Court so that a person in Bryl's position would need to be told that his failure to comply with an officer's request in connection with administering the Intoxilyzer test in accordance with the approved methods, would be deemed a refusal. We reject this argument. Officer Fix told Bryl to rinse his mouth with water to clear his mouth of tobacco on two occasions. The Intoxilyzer test was administered more than 20 minutes after Bryl was told to rinse his mouth out the second time. The approved method of administering the Intoxilyzer test was followed, "but for" the deliberate actions of Bryl. In refusing to follow the reasonable requests of the operator in his conscientious attempt to follow appropriate instructions of the State Toxicologist in administering the Intoxilyzer test, Bryl has, in effect, refused to take the test. Reason dictates that he suffer the consequences of that refusal for the ultimate benefit of society. We thus hold, if a person refuses to cooperate with an operator's attempt to follow the State Toxicologist's approved methods, the person cannot thereafter challenge the foundation for admissibility of the test results on the ground that the approved methods were not followed.[6]

Because there was articulable reasonable suspicion for the investigative stop, and because Bryl cannot refuse to follow reasonable requests of the operator of the Intoxilyzer and then challenge the admission of the Intoxilyzer test results on the basis that the approved methods were not followed, the hearing officer's decision is in accordance with section 39–20–05, N.D.C.C. We thus affirm the judgment of the district court affirming the decision of the Department of Transportation to suspend Bryl's driver's license.

GIERKE, LEVINE, VANDE WALLE and MESCHKE, JJ., concur.

---

**6.** We use the term "refused" in a broader sense than it is used in section 39–20–04, N.D.C.C. However, we see no reason why a person who deliberately attempts to distort the test results could not also be deemed to have refused within the meaning of section 39–20–04, N.D.C.C. As the Department of Transportation did not urge us to find Bryl's actions a refusal within the meaning of section 39–20–04, N.D.C.C., we simply affirm its decision.