STATE of Minnesota, DEPARTMENT OF PUBLIC SAFETY, Petitioner,

v.

James Edward HABISCH, Respondent.

No. 81–410.

Supreme Court of Minnesota.

Dec. 11, 1981.

Warren Spannaus, Atty. Gen., and James Early, Spec. Asst. Atty. Gen., St. Paul, for petitioner.

Samuel A. McCloud, Minneapolis, for respondent.

OTIS, Justice.

This appeal reviews a license revocation hearing under the implied consent law, Minn.Stat. § 169.123 (1978), and raises the issue of whether the trial court was correct in concluding that the state had established sufficient foundation for admitting the results of a Breathalyzer test.[1] That test placed defendant's blood alcohol content at .16%. The district court reversed and we granted the state leave to appeal. We reverse the district court.

The precise issue at the revocation hearing was whether the known alcohol solution used to test the Breathalyzer was too old to be accurate. The appeal panel held that it was, and set aside the revocation.

The record on appeal, including the questioned trial exhibits, establishes the following:

1. The arresting officer, Deputy William Manther, stopped defendant's truck after twice observing him drive over the center line, having earlier received reports concerning erratic driving of the same vehicle.

2. After approaching defendant, Deputy Manther smelled alcohol on his breath and saw that his eyes were red, dilated, and watery and that he was unsteady in his gait.

3. Deputy Manther then arrested defendant and drove him to the police station after defendant agreed to take a breath test. During the ride, which took half an hour, defendant ingested no food and placed nothing else in his mouth. Defendant was also in the deputy's presence at the station for all but 15 seconds and was under observation for at least 10 minutes before he took the breath test.

4. Defendant, given the opportunity to call an attorney, chose instead to call his parents.

5. Sergeant William Tarbell of the Chaska Police Department, after complying with the Breathalyzer operator's checklist provided by the Bureau of Criminal Apprehension Lab, tested defendant's breath. Compliance with this checklist involved the following acts in the following sequence:

(a) Preparation of the machine. This requires switching the machine on, waiting until the thermometer shows the proper temperature; measuring and placing an unopened glass ampoule of alcohol-sensitive reagent into one holder; opening, measuring and placing another glass ampoule (test ampoule) of the same reagent in another holder; and inserting a bubbler and connecting it to an outlet.

(b) Purging the machine.

(c) Testing the machine on room air. If the room air shows an alcohol reading of greater than .01, then the test ampoule must be discarded and a new one used, with the procedure repeated.

(d) Analysis of subject's breath. After the subject has been observed for a set period of time, the operator collects a breath sample, which bubbles through the reagent in the test ampoule. After waiting about a minute and a half to allow the reagent to react to any alcohol in the breath, the officer makes the machine photoelectrically compare the test ampoule with the standard ampoule, measure the amount of color change, and automatically calculate and give a printout reading of the subject's blood alcohol percentage.

(e) Simulator test. This involves purging, then retesting with a simulator solution of known alcohol concentration.[2]

For a more detailed summary of these steps than is contained in the checklist and for a discussion of the reliability of the Breathalyzer brand breath tester, *see* the excellent discussion in Watts, *Some Obser-*

---

1. The Breathalyzer is the brand name of a device for chemically testing person's breath to determine the percent of alcohol in the blood.

2. The design of the Breathalyzer allows rebalancing the light between the standard and the test ampoule even though the test ampoule has

lost some of its color in the tests on the subject's breath. Watts, *Some Observations on Police-Administered Tests for Intoxication*, 45 N.C.L.Rev. 34, 86 (1966). This rebalancing of the light is apparently what is meant when the check list refers to "purging."

*vations on Police-Administered Tests for Intoxication*, 45 N.C.L.Rev. 34, 64–68 (1966).

6. Sergeant Tarbell testified, and the printouts introduced in evidence show, that the room air reading was .00, that defendant's breath reading was .16, and that the simulator solution reading was exactly the same as it was supposed to be, .11.

7. Sergeant Richard Anding, the records custodian at the sheriff's department, testified that the simulator solution was received from the Bureau of Criminal Apprehension on February 2, 1979, and was 62 days old when defendant was tested on April 6. Normally the B.C.A. sent out new simulator solutions every 30 days but the older solution had to be used at that time because the B.C.A. was on strike. Sergeant Anding had been told in training that the simulator solution would lose some of its properties over a period of time but that he did not have any idea how long a period of time this would be. Sergeant Anding's opinion was that the Breathalyzer was in proper working order from February 2, 1979, through April 23, 1979. Records admitted into evidence show that when the solution was received on February 2, the machine was tested three times, each test giving a correct reading of .11. The solution was used a number of times both before and after April 6 and on each of these occasions the machine gave a reading of .11. On April 20 a new solution was used to test the machine and the machine was determined to be running properly. Another test on April 23 corroborated this.

The trial court's memorandum stated as follows:

The key defense of respondent was that the simulator solution, which was used by the Carver County Sheriff's Department in testing of a Breathalyzer machine, was some 62 days old at the time the Breathalyzer machine was tested. In asserting that defense, the respondent offered no testimony nor other proof tending to show that the simulator solution was inadequate or, in fact, not of sufficient quality to test the Breathalyzer machine. Although there was testimony from Sergeant Anding that the solution was generally changed every 30 days and that he had been told in his training that the solution would lose some of its properties over a period of time, there was no suggestion from anyone as to how long that time period would be. Further, the state introduced evidence showing other tests which had been taken and showed generally that the Carver County Sheriff's office performed its functions properly in accordance with the statute and directives. Therefore, this Court is of the opinion that the state has shown through a preponderance of the evidence that the test result, the same showing the respondent's alcohol concentration of .16, was indeed over the .10 standard required by the statute. It is the opinion of this Court that if the defendant wished to offer testimony tending to show that the simulator solution had lost some of its properties and was therefore no longer a valid indicator as to the accuracy of the Breathalyzer machine, that evidence could have been presented by him. However, none was presented and this Court is satisfied that the state has proven its case through a preponderance of the evidence.

The district court held that the county court had placed the burden of proof on defendant and that without a showing by the state that the chemicals were in proper condition, the revocation was improper.

Minn.Stat. § 169.123, subd. 6 (1978) provides that one issue which may be raised at a revocation hearing under the implied consent law is "whether the testing method used was valid and reliable."

The leading Minnesota case dealing with the reliability of the Breathalyzer breath test is *State, City of St. Louis Park v. Quinn*, 289 Minn. 184, 182 N.W.2d 843 (1971). There we held that testimony of the reading obtained by a Breathalyzer test conducted by a certified operator may be admitted without antecedent expert testimony if it is established that the machine was in proper working order and the chemicals in proper condition.

**16**

In *Quinn* when we spoke of the condition of the chemicals, we were referring to the chemicals used in the machine itself, that is, the ampoules of acid reagent. There is no requirement that the state use simulator solution as a means of establishing the proper condition of the chemicals in those ampoules.

The procedure which the B.C.A. Lab recommends for use with the Breathalyzer requires a separate test of room air, which should give a zero result, and a separate test of a simulator solution with a known concentration of alcohol. If these two separate tests give expected results, "This would seem to be almost incontrovertible proof not only that the chemicals are proper but that the instrument is in working order." Watts, *Some Observations on Police-Administered Tests for Intoxication,* 45 N.C.L.Rev. 34, 87 (1966).

The record does not establish how long the simulator solution retains its original alcohol concentration, except that it does lose some of its properties over a period of time. This apparently explains the need for periodically replacing the solution, because if the solution's alcohol concentration changes, that change will be reflected in the test reading. This does not mean that the alcohol content of the solution changes rapidly or that the solution cannot be used after 30 days have expired. Indeed, in this case if the alcohol concentration of the solution had changed, the log book of the Breathalyzer would not show a chain of consistent readings of .11 every time the solution was used to test the machine and the chemicals used in the machine, particularly where new ampoules are used each time the Breathalyzer machine is used. Such a chain of identical readings under those circumstances can not be the product of chance.

In summary, we believe that the trial court correctly concluded that the state had established sufficient foundation to justify admission of the test results. As the trial court stated, defendant was free to come forward with evidence challenging this foundation but did not do so. This does not put the burden of proof on defendant.

Reversed.