Edward L. SCHENSE, Plaintiff
and Appellant,

v.

Walter HJELLE, State Highway Com-
missioner, Defendant and Appellee.

Civ. No. 11063.

Supreme Court of North Dakota.

April 23, 1986.

Thomas K. Schoppert, New Town, for
plaintiff and appellant.

Myron E. Bothun, Asst. Atty. Gen., Bis-
marck, for defendant and appellee.

GIERKE, Justice.

Edward L. Schense appeals from a dis-
trict court judgment upholding the North
Dakota State Highway Commissioner's
(Commissioner) decision to suspend
Schense's driver's license. We affirm.

During April 1985, Schense was arrested
for driving while under the influence of
intoxicating liquor. An Intoxilyzer test ad-
ministered by the arresting highway patrol-
man recorded Schense's blood alcohol con-
centration at 0.15 percent. Following an
administrative hearing during which
Schense and the highway patrolman testi-
fied, the Commissioner suspended
Schense's driving privileges for one year.

Schense asserts on appeal that the sus-
pension should be reversed because there
was inadequate foundation for the admis-
sion into evidence of the Intoxilyzer test
results. He does not claim that there was
a failure to perform the test according to

the State Toxicologist's Approved Method of administering the test, but asserts that no evidence was introduced that the individual "simulator"[1] used during the Intoxilyzer test had been certified or approved by the State Toxicologist as a "device" to be used with the Intoxilyzer 5000, as allegedly required by § 39–20–07(5) and (6), N.D.C.C. The Commissioner contends that the statute requires certification and approval of only specific testing devices, i.e., Breathalyzers and Intoxilyzers, and not the simulator, which is a piece of auxiliary equipment used during the process of calibrating the testing devices.

The version of § 39–20–07(5) and (6), N.D.C.C., in effect at the time of the arrest and administrative hearing, provided in pertinent part:

"5. The results of the chemical analysis must be received in evidence when it is shown that the sample was properly obtained and the test was fairly administered, and if the test is shown to have been performed according to methods and with devices approved by the state toxicologist, and by an individual possessing a certificate of qualification to administer the test issued by the state toxicologist. The state toxicologist is authorized to approve satisfactory techniques, devices, and methods of chemical analysis and determine the qualifications of individuals to conduct such analysis, and shall issue a certificate to all qualified operators. . . .

"6. . . . Upon approval of the methods or devices, or both, and techniques required to perform the tests and the persons qualified to administer them, the state toxicologist shall prepare and file written record of the approval with the clerk of the district court in each county and shall include in the record:

"a. A quarterly register of the specific testing devices currently approved, including serial number, location, and the date and results of last inspection."

■ In determining whether the term "devices" was intended to include auxiliary

---

1. A simulator is a jar-like container in which a standard "known" alcohol solution is added. It is attached to Breathalyzers and Intoxilyzers during a test sequence for the purpose of simulating breath alcohol content to check the accuracy and verify the calibration of the particular breath-testing unit. It is described in 2 Erwin, Defense of Drunk Driving Cases § 22.04 at pp. 22–36 and 22–38 (3d ed. 1985):

"The Simulator is a thermostatically heated sealed device with constant agitation which is heated to keep its contents of water and alcohol at a mouth temperature of 34°C ± 0.2°C. This temperature is verified by a calibrated thermometer which is inserted into the solution.

"The Mark II Simulator and the Mark IIA Alcohol Breath Simulator are manufactured by Smith & Wesson Electronics Co. . . . . They have minor differences such as position of outlet points and type of thermometer used. The Mark IIA uses a 3 prong grounded plug to comply with O.S.H.A. and National Electrical Code requirements, the older units had standard household type plugs for operation on 115 volts A.C. at a maximum power draw of 70 watts for the mixer/heater control. The 'simulator's' dimensions are: height—8½ inches; diameter—4½ inches; total weight—electronics, plus jar and solution—about 3½ pounds; solution volume, at start—500 ml.

The standard solution of 500 ml of a 'known' concentration of alcohol is then added to this simulator."

The State Toxicologist's "Approved Method to Conduct Breath Test with Intoxilyzer" requires the use of a simulator during the testing procedure. The Approved Method provides in relevant part:

"After the sample chamber has been cleared, and the room air test has been completed by the instrument, the display will scroll 'Please Attach Simulator and Depress Start Test Switch' followed by a flashing 'Attach Simulator'. Before attaching the simulator to the Intoxilyzer blow through the simulator for a few seconds, then attach the simulator to the simulator vapor port on the Intoxilyzer. Write down the simulator temperature on the test record, and depress the 'Start Test' switch. As the simulator solution vapor is being introduced into the Intoxilyzer, the display will read 'Std. Sol.'. After the standard simulator test is complete the result will be displayed. The display will scroll the directive 'Please Detach Simulator and Depress Start Test Switch' followed by a flashing instruction to 'Detach Simulator'. Disconnect the simulator from the Intoxilyzer and depresss (sic) the 'Start Test' switch. . . ."

Schense's Intoxilyzer test record card lists the simulator temperature as "34.1°C."

equipment such as the simulator, it is helpful to consider the history of North Dakota's implied consent law. When originally enacted in 1959, § 39–20–07(5), N.D.C.C., provided that "[t]he results of a test given by means of the Harger Drunkometer or other similar device approved by the American Medical Association and the National Safety Council shall be received in evidence when it is shown that the test was fairly administered." *See* 1959 N.D.Sess.Laws Ch. 286, § 7. Upon discovering that the American Medical Association did not, as a matter of policy, endorse or approve any specific product or device [*see State v. Miller*, 146 N.W.2d 159, 164 (N.D.1966)], the Legislature amended the statute by giving the State Toxicologist the authority "to approve satisfactory techniques, devices and methods of chemical analysis," and by providing that the results of such tests shall be received in evidence when it is shown that the test was "performed according to methods and/or with devices approved by the state toxicologist...." 1965 N.D.Sess. Laws Ch. 281, § 1.

It is evident that the Legislature, by its use of the term "devices" in the statute, did not intend to expand the certification and approval requirements of the State Toxicologist to include auxiliary equipment that might be used in conjunction with a specific testing device, but merely recognized the need for a method of approving new testing equipment as it became available for use. We conclude that the term "devices" as used in the statute refers to the testing equipment used to perform the chemical analysis of the subject sample, and not to auxiliary equipment or devices used during the testing procedure. *See State v. Novotasky*, 5 Conn.Cir. 326, 251 A.2d 189 (1968) [the "device" that must be checked for accuracy pursuant to statute before chemical analysis of breath or blood may be admitted in evidence is the apparatus used in analyzing the sample collected rather than the device used in collecting the sample]; *State v. Tarcha*, 3 Conn.Cir. 43, 207 A.2d 72 (1964) [a doctor's syringe used to extract blood for purpose of chemical test was not a "device" required by statute to be tested for accuracy before results of chemical test could be received in evidence].

We are aware of one case, *Harrell v. State*, 693 S.W.2d 693 (Tex.Ct.App.1985), in which the defendant's conviction for driving while intoxicated was reversed for failure of the state to show final certification of the reference simulator used in conjunction with the Intoxilyzer in administering the breath test. *Harrell* is distinguishable, however, because the Texas Breath Testing Regulations promulgated by the Texas Department of Public Safety expressly required approval and certification of the reference simulator as a precondition to admissibility of test results. The Texas regulations required certification of individual "breath test instruments and allied equipment," including "the reference sample devices," and it was "undisputed that the reference simulator is 'Allied Equipment' as defined in the regulations." *Harrell, supra*, 693 S.W.2d at 695. Our statutory scheme contains no such requirement.

■ Schense asserts that whenever an auxiliary device is used in conjunction with a breath testing device, test results should be inadmissible absent proof that those devices have been individually approved and certified by the State Toxicologist. He relies in part on *State v. Ghylin*, 222 N.W.2d 864, 869 (N.D.1974), in which this court held that, in order to meet the statutory requirement that a test be "fairly administered," the foundation for the introduction in evidence of the results of a Breathalyzer test "requires proof at the very least that the ampules used in performing the test are what they purport to be and have been approved, by spot-checking or analysis by the State Toxicologist or other competent authority" and "that the 'known solution' is what it purports to be, namely, a 0.10 per cent solution of alcohol and water; ..." *See also State v. Salhus*, 220 N.W.2d 852 (N.D.1974) [pertaining to foundation for

"known solution"]. However, in *Ghylin, supra,* 222 N.W.2d at 866, the record contained testimony "that the correct composition of the chemicals in the ampules was critical to the operation of the machine," and in *Salhus, supra,* 220 N.W.2d at 858–859, the record contained evidence concerning the importance of the integrity of the "known solution" to the validity of the calibration test.

In the present case, Schense has not informed us, nor does the record reflect, how the validity of a calibration test could be affected by the simulator used during the test sequence. He has not asserted that the simulator used in the present case was defective in some manner, or even assuming that were the case, that defective simulators affect test results. Although Schense appears to find relevant that the simulator and Intoxilyzer used in this case were manufactured by different companies, there is neither evidence in the record nor an assertion in Schense's brief that this fact renders the test results unreliable. Upon a proper record, we might be persuaded that an auxiliary device used in the testing sequence is of such a nature that, absent specific approval and certification of the device by the State Toxicologist, the test results would be so fraught with the possibility of error that the test could not be considered to be "fairly administered" within the meaning of the statute. The record in this case falls far short of such persuasion. *Cf. Pladson v. Hjelle,* 368 N.W.2d 508, 513 (N.D.1985) [motorist's failure to offer evidence concerning need for freshness of standard solution or how time could affect solution or its accuracy precluded assertion that Breathalyzer test was inaccurately or unfairly administered].

■ Schense also claims that his suspension should be reversed because there was a discrepancy in the serial numbers identifying the simulator used during the testing sequence. The Intoxilyzer test record card shows the serial number of the simulator used to be 0471719. During the administrative hearing, the parties examined the simulator and found that serial number 0471719 was written on a piece of tape which covered the manufacturer's serial number etched into the metal. Upon inspection with a magnifying glass, the parties discovered that the manufacturer's serial number was actually 0471713. The highway patrolman who administered the test testified that this simulator was the one he used during Schense's Intoxilyzer test sequence. We fail to see under these circumstances what possible effect the discrepancy in the serial numbers could have had on the validity of the test results. We conclude, therefore, that Schense's assertion is without merit.

The judgment is affirmed.

ERICKSTAD, C.J., and VANDE WALLE, LEVINE and MESCHKE, JJ., concur.

LEVINE, Justice, concurring specially.

I write specially to highlight the distinction between this case and two recent decisions, *Moser v. North Dakota State Highway Commissioner,* 369 N.W.2d 650 (N.D. 1985) and *Schirado v. North Dakota State Highway Commissioner,* 382 N.W.2d 391 (N.D.1986).

*Moser* and *Schirado* each involved a failure to follow procedures already established by the State Toxicologist. Because we assume the State Toxicologist has reasons for establishing procedures related to assuring reliable results, we concluded that the State must establish that a deviation from these established procedures does not affect the dependability of the test results. In the instant case, the State Toxicologist did not approve the simulator as a "device" and we conclude that the statute does not require him to do so. Thus, there is no analagous breach of procedure here. If there should be a rule requiring simulators to be approved by the State Toxicologist, it is the party asserting that proposition who must provide supporting evidence.

VANDE WALLE, J., concurs.