Leonard BERGER, Appellant,

v.

STATE HIGHWAY
COMMISSIONER, Appellee.

Civ. No. 11207.

Supreme Court of North Dakota.

Oct. 15, 1986.

Pulkrabek & Tuntland, Mandan, for appellant; argued by Thomas M. Tuntland.

Steven F. Lamb, Asst. Atty. Gen., State Highway Dept., Bismarck, for appellee; argued by Steven F. Lamb.

ERICKSTAD, Chief Justice.

Leonard Berger appeals from a district court judgment affirming a decision of the North Dakota State Highway Commissioner (Commissioner) to suspend Berger's driver's license pursuant to Ch. 39–20, N.D. C.C. We affirm.

On November 16, 1985, Berger was placed under arrest for driving while under the influence of alcohol. Officer Richard Weigelt observed Berger's car heading southward on Highway 6 approximately five miles south of Mandan. He followed Berger's car for approximately one-half mile when the car appeared to be weaving within the roadway, driving on the center line, and at one point crossing over the center line. Officer Weigelt turned on his red lights, stopped the car, and then approached the driver. During the course of questioning, he detected an odor of alcohol on Berger's breath. He then asked Berger to step out of the vehicle and walk towards the patrol car. While walking back towards the patrol car, the officer noticed a slight sway in Berger's walk. When Berger entered the patrol car, the officer advised him why he had stopped him and the officer then gave Berger a nystagmus gaze test. Berger failed the test. The officer then asked Berger to step out of the patrol car and administered another field sobriety test. The officer asked Berger to raise one foot six inches off the ground in front of him for thirty seconds. He was not able to lift one foot up in front of him for more than a few seconds. The officer next asked Berger to walk heel to toe for seven steps, turn around and walk back seven steps. Berger was not able to accomplish

this task without losing his balance. The officer then placed Berger under arrest for driving while under the influence of alcohol and advised of his *Miranda* rights.

Officer Weigelt then drove Berger to the Morton County Jail for a blood alcohol test utilizing the Intoxilyzer 5,000. Officer Weigelt, a certified Intoxilyzer operator, conducted the blood alcohol test of Berger approximately 25 minutes after Berger was out on the highway. The Intoxilyzer test results indicated a blood alcohol concentration of 0.13 percent by weight. After completion of the test, Officer Weigelt took posession of Berger's driver's license pursuant to Section 39-20-03.1(1), N.D.C.C.

On November 18, 1985, Berger requested an administrative hearing pursuant to Section 39-20-05, N.D.C.C. On the same day, Berger's attorney submitted an eight page document titled "Request for Full Information" to the arresting officer, the administrative hearing officer, and the State Toxicologist.

On November 22, 1985, the administrative hearing officer responded to Berger's request by sending him a copy of his arrest form (Exhibit # 1) and Intoxilyzer test record (Exhibit # 9).

On December 6, 1985, an administrative hearing was held regarding the suspension of Berger's license. At the conclusion of the administrative hearing, the Commissioner's hearing officer made the following findings of fact, conclusions of law, and decision:

"The findings of fact are that Patrolman Weigelt followed a vehicle that went over the center line and weaved within its lane of travel. He stopped the driver, Mr. Berger, who smelled of alcoholic beverages on his breath. He swayed walking back to the patrol. His eyes showed nystagmus in extreme position and at onset. He was unable to lift one foot up for more than a few seconds. He did not walk heel to toe without losing his balance. Officer Weigelt arrested Mr. Berger for driving while under the influence of intoxicating beverages and offered him a chemical test of his breath. Mr

Berger submitted to the test and the results showed that he had .13 percent blood-alcohol content by weight.

"The conclusions of law, by a preponderance of the evidence, I find Officer Weigelt had the grounds to stop Mr. Berger. And then he gained the grounds to believe that he had violated 39-08-01 of the North Dakota Century Code. I find Mr. Berger was arrested.

" ... Mr. Berger was tested in accordance with sections 39-20-01 and 39-20-03. I find Mr. Berger was fairly tested and the results showed that he had over .10 percent blood-alcohol content by weight.

"The decision, then, is that Mr. Berger's driving privileges will be suspended for 91 days."

Berger appealed from the hearing officer's decision to the district court. The district court affirmed the administrative hearing officer's decision. Berger appealed from the district court judgment and raises the following issues:

I. Whether or not Berger was denied access to relevant information that violated his rights in accordance with statutory (Administrative Agencies Practice Act, Ch. 28-32, N.D.C.C.), and constitutional due process for administrative hearings.

II. Whether or not there was sufficient foundation for the administrative hearing officer to conclude that the Intoxilyzer test had been fairly administered.

An appeal from a district court judgment involving a license suspension under Section 39-20-04.1, N.D.C.C., is governed by the Administrative Agencies Practice Act, Ch. 28-32, N.D.C.C., and our review is limited to an examination of the record compiled before the administrative agency rather than the findings of the district court. *Moser v. North Dakota State Highway Commissioner*, 369 N.W.2d 650 (N.D. 1985); *Dodds v. North Dakota State Highway Commissioner*, 354 N.W.2d 165 (N.D. 1984):

"Our role in reviewing the factual basis of an administrative decision is limit-

ed to a consideration of the following questions: '(1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law?' *Asbridge, supra.* [*Asbridge v. North Dakota State Highway Commissioner,* 291 N.W.2d 739 (N.D.1980).] This Court also considers whether the decision violates constitutional rights or is not in accordance with the law. *See,* § 28–32–19, N.D.C.C. We exercise restraint in reviewing the findings of an administrative agency; we do not substitute our judgment for that of the agency." *Dodds,* 354 N.W.2d at 168–69.

In conjunction with his first issue, Berger argues that his statutory and constitutional rights were violated because he was denied access to the inspection and maintenance records of the Intoxilyzer and simulator. He claims that he was denied the right to subpoena necessary witnesses because he was not provided with the names of people to subpoena pursuant to his request. He suggests that by being denied this information, names and records, he was not able to cross-examine or challenge the credibility of his Intoxilyzer test results and thus was not afforded a fair hearing.

We posed and answered the question concerning the required degree of due process before an administrative board in *First American Bank & Trust Company v. Ellwein,* 221 N.W.2d 509, 514 (N.D. 1974), *cert. denied,* 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301, *reh'g denied,* 419 U.S. 1117, 95 S.Ct. 798, 42 L.Ed.2d 816 (1975):

"What constitutes due process within an administrative proceeding? While recognizing that the adjudicative function of the Board is quasi-judicial in nature, we have never held that the minimal due process that must be afforded participants before an administrative board or agency is synonymous with minimal requirements of due process in a court of law. To do so would be to create a second judicial branch without statutory authority and add to time re-

quired in the disposition of administrative decisions."

■ While Berger cannot demand equivalent due process followed in courts, he was entitled to procedural fairness in his administrative hearing. *Kobilansky v. Liffrig,* 358 N.W.2d 781, 787 (N.D.1984). In *Kobilansky,* 358 N.W.2d at 787, we quoted the United States Supreme Court decision in *Mackey v. Montrym,* 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979), specifying the factors considered necessary in determining what process is due in an administrative context:

" ' "[F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." ' *Mackey v. Montrym,* 443 U.S. 1, 12, 99 S.Ct. 2612, 2617, 61 L.Ed.2d 321 (1979) quoting *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)."

The first factor in the *Mackey* paradigm is to identify the nature and weight of the private interest affected by the official action challenged. We concluded in *Kobilansky* that a driver's private interest cannot be considered insignificant. We noted that the "loss of driving privileges is not insubstantial and may entail economic hardship and personal inconvenience." *Kobilansky,* 358 N.W.2d at 787. Furthermore, as the United States Supreme Court noted in *Mackey,* 443 U.S. at 12; 99 S.Ct. at 2617, the driver's interest in the continued possession and use of his license through the hearing process is a substantial one.

The second factor to be considered in the *Mackey* paradigm is the likelihood of erroneous deprivation of the private interests involved as a consequence of the procedures used. *Mackey,* 443 U.S. at 14, 99

S.Ct. at 2618. This inquiry requires an assessment of the relative reliability of the present procedures and the additional procedures sought. The due process clause does not require that administrative decision making comply with standards that assure error free determinations. *Mackey*, 443 U.S. at 14, 99 S.Ct. at 2618. The fundamental requirement of due process is the opportunity to be heard. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1920).

■ Berger premises his due process argument on the belief that the Intoxilyzer and simulator maintenance and inspection records were private. Berger's assumption is not correct. Section 44–04–18, N.D. C.C.,[1] declares what constitutes public records and provides reasonable access for the public to inspect such documents. Berger had the opportunity prior to his administrative hearing to inspect the Intoxilyzer and simulator maintenance and inspection records at the State Toxicologist's office. He could have subpoenaed the State Toxicologist or could have requested the administrative hearing officer to have the State Toxicologist subpoenaed pursuant to Section 28–32–09, N.D.C.C.[2] We thus cannot conclude that Berger was denied access to relevant information by an affirmative act of the administrative agency.

■ Berger contends that although he didn't subpoena or have the State Toxicologist subpoenaed he should have been provided with the Intoxilyzer and simulator inspection and maintenance records pursuant to his "Request for Full Information." He claims that, as he did not receive the requested information he was denied due process because, in accordance with Section 28–32–09, the administrative hearing officer was under a statutory mandate to provide him with this information.

In 1977 the North Dakota Legislature amended Section 28–32–09 to include the following:

"A subpoena to compel a witness to produce documentary evidence will be issued to a party other than the agency only *upon petition showing general relevance and reasonable scope of the evidence sought*, which petition must also specify with particularity the books, papers, or documents desired." [Emphasis added.] 1977 N.D.Sess.Laws Ch. 284, § 4.

The language of the amendment indicates that its purpose is to protect against possi-

---

1. Section 44–04–18, N.D.C.C., reads:

   "*44–04–18. Access to public records—Penalty.—*

   "1. Except as otherwise specifically provided by law, all records of public or governmental bodies, boards, bureaus, commissions or agencies of the state or any political subdivision of the state, or organizations or agencies supported in whole or in part by public funds, or expending public funds, shall be public records, open and accessible for inspection during reasonable office hours.

   "2. Violations of this section shall be punishable as an infraction."

2. Section 28–32–09, N.D.C.C., provides:

   "*28–32–09. Subpoena and attendance of witnesses.* Any officer, examiner, chairman, or acting chairman of any administrative agency, upon request of any party to a hearing conducted by it, or upon his own motion on behalf of the agency, shall require by subpoena the attendance and testimony of witnesses and the production of the documents and other objects described in such subpoena at such hearing or proceeding, and the cost of serving such subpoena shall be paid by the person or agency requesting it. A subpoena to compel a witness to produce documentary evidence will be issued to a party other than the agency only upon petition showing general relevance and reasonable scope of the evidence sought, which petition must also specify with particularity the books, papers, or documents desired. The deposition of a witness or party in any proceeding before an agency may be taken in the same manner and on the same notice as in a civil action pending in the district court. Interrogatories may be sent to any witness or party in any proceeding in the same manner and on the same notice as in an action pending in the district court. A party, other than the administrative agency, must first show good cause before undertaking discovery proceedings, including interrogatories. Any witness who is subpoenaed under the provisions of this section and who appears at the hearing, or whose deposition is taken, shall receive the same fees and mileage as a witness in a civil case in the district court, and such fees shall be paid by the party or agency at whose instance the witness appears or his deposition is taken."

ble discovery abuse in administrative proceedings by requiring a showing of "general relevance and reasonable scope of the evidence sought." [3] Section 28–32–09 further provides that "[a] party, other than the administrative agency, must first show good cause before undertaking discovery proceedings." Section 28–32–09 specifically authorizes the use of interrogatories and depositions "in the same manner and on the same notice as in a civil action." Thus, when a party makes a request to discover information, the general provisions governing discovery contained in the North Dakota Rules of Civil Procedure are to be applied to Section 28–32–09. Rule 26(b), N.D. R.Civ.P., limits the scope of discovery to material "which is relevant to the subject matter involved in the pending action."

Berger, in his request for information, asks for the names of various individuals, including: Who put the solution into the simulator used in his test? Who, if anyone, recorded the position of the mode selection switches prior to, during, and after conducting his test? Who, if anyone, recorded any of the characters that scrolled across the display during his test? Who, if anyone, checked the characters that scrolled across the display during his test? Who, if a signal drift and stability test was conducted on the Intoxilyzer used in his test, performed such a test? Who was the field inspector that tested the Intoxilyzer prior to his test? Who was the field inspector that tested the Intoxilyzer prior to his test? Who was the field inspector that tested the Intoxilyzer after the date of his test? Who, if a radio frequency test was conducted on the Intoxilyzer, performed such a test?

Berger did not set forth good cause in his document as required by Section 28–32–09. Berger's document did not establish general relevancy. He does not argue that the requested information he sought would have made a difference, he only asserts that it *might* have made a difference had he received it.

We conclude that the petition showed insufficient relevance to require the hearing officer, under Section 28–32–09 to comply with Berger's demands. Although some of the information requested by Berger may have been relevant upon a proper showing, we will not impose on the administrative hearing officer the burden of sifting through Berger's eight page list of demands to determine what might be relevant upon a proper showing, and what would not be relevant.[4]

---

3. Frank Magill (now Judge, Court of Appeals for the Eighth Circuit), North Dakota Railway Lines attorney, proposed the amendment to bring state administrative proceedings in conformity with rules in the Interstate Commerce Commission. He said:

"In discovery proceedings they can take a deposition. There is some abuse of these provisions unless there is a provision for showing good cause. This only applies to state agencies and not to political subdivisions. When it comes to any other party to an administrative agency they would have to go to the commission and show good cause. For parties to a procedure other than the agency itself this is necessary; the agency would have no place to go to to show good cause." N.D. Legislative Council, State and Federal Government Standing Committee Minutes, H.B. 1063 (Feb. 15, 1977).

4. Berger's eight page request for full information perhaps could be considered an excessive use of a discovery device. For example, Berger, in his second item demands:

"2. Please provide a copy of any intoxilyzer log, including standard solution logs or simulator logs, for the period from two months preceding the test of the Defendant's breath to the present. If the simulator used in connection with the test of defendant's breath was also used in connection with other devices such as a breathalyzer, please include all logs relating to that simulator or standard solution in connection with the other device for the period from two months preceding the test of the Defendant's breath to the present. In respect to the simulator test please state if the solution used in the simulator was prepared, analyzed or inspected by you, the office of the state toxicologist, or any other office. If so: (a) Please provide any identifying number or designation for the solution; and (b) please provide copies of any analytical report prepared in connection with approval of that solution including any supplemental analytical reports known to you to exist."

Further evidence of the detail in his request is item 17:

The administrative hearing officer responded to Berger's request by sending him a copy of the arrest form and Intoxilyzer test results. Berger took no action to press his request for further information. He did not reiterate his request. He did not initiate formal discovery.[5] He did not apply for an order to compel discovery pursuant to Section 28–32–09, N.D.C.C., analogous to Rule 37, N.D.R.Civ.P. He did not avail himself of the opportunity under Section 39–20–05(1), N.D.C.C.,[6] to request from the hearing officer a ten-day extension of the hearing in order to obtain information he thought necessary and relevant. He did not utilize the opportunity to petition for a rehearing pursuant to Section

"17. Please state when and where the operator of the intoxilyzer was trained in its operation. In this connection if any written, recorded or audio-visual materials were used in connection with such training please identify all such materials, state when and where such materials are available for inspection and copying and as to each document or other item identified please give an estimate of the cost of providing a usable copy to the undersigned."

We find Berger's request to be a coextensive demand for information as well as a demand for the production of documents. In effect, Berger attempts to have the administrative agency conduct his research to examine its records and other agencies' records for possible information that may or may not be relevant. Berger pursues his request for possible radio frequency interference as follows:

"12. (a) If the machine used to test the defendant's breath was shielded against Radio Frequency Interference or had filters installed to reduce or eliminate Radio Frequency Interference please state in detail what shielding techniques were used, the dates that any RFI shields or filters were installed, and the dates such shielding or filtering techniques were approved by the manufacturer of the device.

"(b) If the device was not shielded please state what precautions were used to ensure that the test results would not be affected by Radio Frequency Interference ('RFI'). In this respect if the device has any form of 'self-check' to test for the presence of Radio Frequency Interference please describe all precautions utilized to determine that the 'self-check' was functioning properly, state the last date that the 'self-check' was tested, identify by name, business address and business telephone the person conducting any such test, and if the results of such testing were reduced to writing in any manner please submit a copy of the written results."

The Commissioner states, however, without documentation, that "[t]he procedures used by North Dakota are presently putting a strain on state government including but not limited to: the highway patrol to the city police, the Drivers License Division to the Legal Division of the highway department, administrative hearing officers to the district courts and supreme court of the state." While we cannot adopt *per se* the Commissioner's statement, we note the probable dilatory effect of enforcing such boundless discovery in administrative proceedings. Professor Moore comments concerning the appropriate scope of discovery in administrative proceedings as follows:

"While the Federal Rules are generally applicable to administrative subpoena enforcement proceedings, a blanket application of the discovery provisions would jeopardize the effectiveness of the investigative process by interfering with the proceedings' summary character. Therefore, a court can limit application of the discovery Rules where, in its discretion, complete application would frustrate the enforcement proceeding's purpose. Expeditious alternatives, such as the in-court examination of those involved, have been permitted in lieu of discovery." 4 Moore's Federal Practice, Section 26.51 (1984).

We find that Section 28–32–09 provides for judicial discretion to limit administrative discovery by requiring that "[a] party ... must first show good cause before undertaking discovery proceedings, including interrogatories."

5. We recognize that the time periods for discovery under our Rules of Civil Procedure do not easily mesh with the time constraints under Section 39–20–05(1), N.D.C.C.

6. Section 39–20–05(1), N.D.C.C., reads:

"1. Before issuing an order of suspension, revocation, or denial under section 39–20–04 or 39–20–04.1, the commissioner shall afford that person an opportunity for a hearing if the person mails a request for the hearing to the commissioner within five days after the date of issuance of the temporary operator's permit. The hearing must be held within twenty days after the date of issuance of the temporary operator's permit, but the hearing officer may extend the hearing to within thirty days after the issuance of the temporary operator's permit if good cause is shown. If the hearing date is extended beyond twenty days from the issuance of the temporary operator's permit, the commissioner shall provide extended temporary operator's privileges to the date of the hearing. If no hearing is requested within the time limits in this section the expiration of the temporary operator's permit serves as the commissioner's official notification to the person of the revocation, suspension, or denial of driving privileges in this state."

28–32–14, N.D.C.C.[7] He did not make application to adduce additional evidence pursuant to Section 28–32–18, N.D.C.C.[8]

The assertion that Berger was denied due process to obtain relevant information is unconvincing when procedures were available for possible use which he did not attempt to utilize.

■ Berger also contends that the testing procedures approved by the State Toxicologist are incomplete and deny him due process of law. He suggests that the approved method should specify at what temperature the standard solution should be, at what level in the simulator the standard solution should be, and in which position the Intoxilyzer switches should be. He claims that the State Toxicologist's statutory authority provides him with unlimited power to promulgate an unscientific or incomplete approved method. He concludes that his due process rights are violated because present procedures do not afford him the opportunity to challenge an unscientific or incomplete approved method.

The Commissioner argues that this issue cannot be raised on appeal because it was not specified as an issue in Berger's notice of appeal and specifications of error. The Commissioner relies upon Section 28–32–15,

N.D.C.C. Section 28–32–15 provides that a party shall initiate an appeal "by serving a notice of appeal and specifications of error specifying the grounds on which the appeal is taken...." Berger's second and third specifications of error read:

"The Hearing Officer erred in receiving the results of an intoxilyzer test administered to the Appellant in that the Appellant was not afforded [an opportunity] ... to contest the results of that test, nor was he afforded sufficient information, after he had requested said information to allow him a meaningful opportunity to challenge the results of said test. Thus, the Appellant, was denied his due process rights to a meaningful hearing."

"The Hearing Officer erred in concluding that the Appellant had a blood alcohol concentration of at least ten one-hundredths of one percent by weight, as that conclusion was necessarily based upon the intoxilyzer test results which were improperly admitted into evidence and when the intoxilyzer test was not shown to be fairly administered or scientifically reliable."

The Commissioner argues that this language is too broad and vague to comport with Section 28–32–15. The Commissioner

7. Section 28–32–14, N.D.C.C., provides:

"28–32–14. *Petition for rehearing.* Any party before an administrative agency who is aggrieved by the decision thereof, within fifteen days after a copy of such decision has been mailed or delivered to such party by the administrative agency, may request a rehearing by such agency; provided, however, that any party appearing before the workmen's compensation bureau may have thirty days within which to request a rehearing. He shall submit with the request for rehearing a statement of any further showing to be made in the proceeding, and such request and statement shall constitute a part of the record in the proceeding. The administrative agency may deny such request for rehearing or may grant the same on such terms as it may prescribe. This section, however, shall not limit the right of any agency to reopen any proceeding under. any continuing jurisdiction which is granted to any such agency by any law of this state."

8. Section 28–32–18, N.D.C.C., reads:

"28–32–18. *Consideration of additional or excluded evidence.*—If an application for leave to adduce additional evidence is made to the court in which an appeal from a determination of an administrative agency is pending, and it is shown to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing or proceeding had before the administrative agency, or that such evidence is material to the issues involved and was rejected or excluded by the agency, the court may order that such additional evidence be taken, heard, and considered by such agency on such terms and conditions as the court may deem proper. After considering such additional evidence, the administrative agency may amend or modify its findings of fact, conclusions of law, and decision, and shall file with the court a transcript of such additional evidence together with its new or modified findings of fact, conclusions of law, and decision, if any."

**686**

relies upon our decision in *Gramling v. North Dakota Workmen's Compensation Bureau*, 303 N.W.2d 323 (N.D.1981). In *Gramling* we held that failure to object to evidence introduced at the administrative hearing did not properly present the question to the appellate court on review. In this case, Berger presented a detailed due process and foundation objection against the introduction of the Intoxilyzer test results in the administrative hearing. He contended that "if the approved method should have been received in evidence, and I maintain that it should not have, the evidence shows that there are significant factors missing from the approved method that are critical to the fair administration of the test." He continued, "[I]t is evident that it is not complete thereby denying us the right to due process of law."

The *Gramling* decision is not controlling because the questioned evidential issue in *Gramling* was not raised at the administrative hearing and was raised for the first time on appeal. The Commissioner notes that the purpose of the specificity requirement is "to alert both the Commissioner and the trial court about what matters are truly at issue." *Palbicki v. Commissioner of Public Safety*, 347 N.W.2d 512, 515 (Minn.App.1984). Although the specifications of error might have been more precise, we find that the language used in Berger's specifications of error read together with the transcript of the administrative hearing sufficiently alerted the Commissioner concerning this part of Berger's due process contention. Additionally, we have said that our standard of review concerning administrative agency decisions extends to determine whether "[t]he decision is in violation of the constitutional rights of the appellant." Section 28–32–19(2), N.D.C.C.; *Dodds*, 354 N.W.2d at 168–69.

■ The Legislature has authorized the State Toxicologist, pursuant to Section 39–20–07(5), N.D.C.C., to approve satisfactory devices and methods for Intoxilyzer tests. The majority of our Court has required a precise compliance with the State Toxicolo-

gist's approved method to ensure a uniform basis of testing throughout the state. *Moser v. North Dakota State Highway Commissioner*, 369 N.W.2d 650, 654 (N.D.1985). If Berger believed that the State Toxicologist's approved method is not complete or scientific, he could, and probably should, have challenged the approved method with expert testimony. He could, and probably should, also have subpoenaed the State Toxicologist and challenged the approved method through cross examination if he believed the approved method to be faulty.

We have held that once the State Toxicologist's approved method is followed the driver must do more than raise the possibility of error. *Dodds*, 354 N.W.2d at 170. A court cannot determine that the approved method is incomplete or unscientific unless it is provided with evidence. No evidence to that effect was submitted. We conclude that the present procedures available to a driver are sufficient to provide him with the tools to challenge the integrity of the approved method of the State Toxicologist.

■ The third and final factor to be considered in the *Mackey* paradigm is to identify the governmental function involved and to weigh and balance the state interests served by the administrative procedures used, as well as the administrative and fiscal burden, if any, that would result from the additional procedures sought. *Kobilansky*, 358 N.W.2d at 791. As we said in *Kobilansky*, the obvious state interest served by the implied consent statute is to promote the public safety by depriving the drunk driver of the privilege of continuing to drive. And, as in *Kobilansky*, we take judicial notice of the carnage caused by the drunk driver.

We stated the purpose of the implied consent statute in *Asbridge v. North Dakota State Highway Commissioner*, 291 N.W.2d 739, 750 (N.D.1980):

"The purpose of the implied consent law is to discourage individuals from driving an automobile while under the influence of intoxicants; to revoke the driving privileges of those persons who do drive while intoxicated; and to provide an effi-

cient means of gathering reliable evidence of intoxication or nonintoxication. To further this objective, the Implied Consent Act provides for civil administrative proceedings in appropriate instances.

.　　.　　.　　.　　.

"The hearing officer is not expected to conduct a criminal trial, for the license revocation proceeding is not criminal in nature. It is an exercise of the police power for the protection of the public. *State v. Brude*, 222 N.W.2d 296 (N.D. 1974). We are aware of the importance of the driving privilege in our society today, but we also recognize that the privilege cannot be granted without limitations as to its continuation."

To give effect to Berger's eight page document of demands without a showing of good cause and general relevancy we would be compelling a discovery mechanism for administrative proceedings of a burdensome nature in excess of what is available under our rules for civil and criminal procedure. Without that showing, and especially in light of the fact that much of the information was available to Berger by inquiry of the custodian of the records, we find no basis for finding a due process violation.

We conclude, as in *Kobilansky*, 358 N.W.2d 791, that "[t]he state's interest in public safety is substantially served by the Commissioner's suspension procedures of those who drive while intoxicated." The administrative hearing provided Berger with the fundamental requirements of due process, notice, and the opportunity to be heard.

■ The second issue is whether or not there was sufficient foundation for the administrative hearing officer to conclude that the Intoxilyzer test had been fairly administered. Section 39–20–07, N.D.C.C., provides the foundational requirements for the admittance of Intoxilyzer test results. Berger argues that the procedures articulated by this Court in *State v. Salhus*, 220 N.W.2d 852 (N.D.1974), and *State v. Ghylin*, 222 N.W.2d 864 (N.D.1974), were not

followed. We note, however, that Section 39–20–07 was subsequently amended by the state legislature after the *Salhus* and *Ghylin* decisions. In the later *State v. Ghylin* decision, 248 N.W.2d 825 (N.D. 1976), we examined the effect that the amendment had on foundational requirements. In *Ghylin* we presented the minimum foundational requirements as follows:

"1. The results of a chemical analysis of a person's breath is admissible in evidence when it is shown that the test was: (1) fairly administered; (2) performed according to the methods and with devices approved by the state toxicologist; and (3) performed by an individual possessing a certificate of qualification to administer the test issued by the state toxicologist." *Ghylin*, 248 N.W.2d at 826 (Syllabus by the Court).

The first question under this analysis is whether Berger's Intoxilyzer test was fairly administered. Berger argues that his breath sample had not been properly obtained. He points to the failure of the arresting officer to testify that a clean mouthpiece was used each time Berger's breath was collected. Although the arresting officer did not testify that he used a clean mouthpiece between breath tests, he did testify that "[p]rocedures were followed." That testimony is disclosed from the following:

"[OFFICER] WEIGELT: May I make a comment?

"Mr. KENNELLY: Yes, go ahead.

"[OFFICER] WEIGELT: Okay, on the approved method, it starts right out instructing to use the form 106–1, that form which is the Intoxilyzer Test Record. Everything that Mr. Tuntland has brought up, as far as the serial number, and the temperature ... the serial number of the simulator and the temperature there is all documented. Therefore, I believe that it's all a part of that document. Procedures were, followed."

Berger does not argue that a clean mouthpiece was not used, he contends that without such testimony his Intoxilyzer test result was improperly admitted into evi-

dence. He claims that this omission renders his Intoxilyzer test result unreliable and thus should be excluded as hearsay.

We decided a similar issue in *Kobilansky v. Liffrig*, 358 N.W.2d 781 (N.D.1984). In *Kobilansky* we held that test results and other documents are not excluded as hearsay in accordance with Rule 803(8), N.D.R. Ev., providing their admission does not unfairly prejudice the adverse party and constitutes probative evidence. Rule 803 provides a number of exceptions to the hearsay rule. The part pertinent for this issue reads:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 *     *     *     *     *     *

"(8) *Public Records and Reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (i) the activities of the office or agency, or (ii) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (iii) in civil actions and proceedings and against the State in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, *unless the sources of information or other circumstances indicate lack of trustworthiness."* [Emphasis added.] Rule 803(8), N.D.R.Ev.

The Commissioner produced as evidence a certified copy of the "Standard Solution Analytical Report" documenting that the State Toxicologist certified and approved standard solution 279. The Commissioner also produced as evidence a certified copy of the "Intoxilyzer Test Record" used by the arresting officer in administering Berger's breath test. The record established that the arresting officer was a certified Intoxilyzer operator. The record also established that the testing Intoxilyzer's serial number was S/N 64–0805 and that this machine was tested on May 23, 1985, and

approved on July 2, 1985, by the State Toxicologist.

Section 39–20–05(4), N.D.C.C., provides that at an administrative hearing the "regularly kept records of the commissioner may be introduced" and that "[t]hose records establish prima facie their contents without further foundation." In 1985 Section 39–20–05(4) was amended to provide that:

"a certified copy of the checklist and test records received by the commissioner from a certified breath test operator, and any copy of a certified copy of a certificate of the office of the state toxicologist relating to approved methods, devices, operators, materials, and checklists used for testing for blood alcohol concentration received by the commissioner from the office of the state toxicologist or the clerk of district court, are regularly kept records of the commissioner."

In *Pladson v. Hjelle*, 368 N.W.2d 508, 512 (N.D.1985), we said if a driver wanted to discredit the prima facie fairness and accuracy of a test, it was the driver's responsibility to produce evidence that the test was not fairly or adequately administered. Because Berger had the opportunity to cross examine the Intoxilyzer operator and did not produce any evidence of his own, he cannot rely on the possibility that a clean mouthpiece was not used to prove that the test was not fairly administered. A driver must do more than raise the mere possibility of error. *Dodds*, 354 N.W.2d at 170.

■ Berger further argues that the test result is untrustworthy because there was no proof as to the chain of custody authenticating the standard solution. In *State v. Ghylin*, 248 N.W.2d 825, 827 (N.D.1976), we required that the standard solution be what it purports to be. The Intoxilyzer operator testified that the standard solution 279 was used to conduct Berger's test. The State Toxicologist approved standard solution 279. The State Toxicologist noted that "[a] proper result for the standard test using this solution should be in the range

of 0.100% to 0.119%." The Intoxilyzer test record indicates that the standard solution test result for solution 279 was 0.107% and that the room test was 0.000%.

The Minnesota Supreme Court commented concerning the reliability of Breathalyzer test results in *State, Department of Public Safety v. Habisch*, 313 N.W.2d 13, 16 (Minn.1981):

> "The procedure which the B.C.A. Lab recommends for use with the Breathalyzer requires a separate test of room air, which should give a zero result, and a separate test of a simulator solution with a known concentration of alcohol. If these two separate tests give expected results, 'This would seem to be almost incontrovertible proof not only that the chemicals are proper but that the instrument is in working order.' *Watts, Some Observations on Police-Administered Tests for Intoxication*, 45 N.C.L.Rev. 34, 87 (1966)."

The Minnesota Court of Appeals extended the intrinsic reliability of Breathalyzer test results to include the Intoxilyzer in *State v. Jensen*, 351 N.W.2d 29, 33 (Minn. App.1984). We recognize that the machine used in this case was an Intoxilyzer, not a Breathalyzer, but the latter case does disclose the confidence which one appeals court has placed in such a testing device.

We determine that the evidence received demonstrates that the standard solution used during the Intoxilyzer test was adequate for producing accurate and valid test results.

■ Berger also contends that the date of inspection for the Intoxilyzer was not made within the "not-too-distant past." *See Ghylin*, 222 N.W.2d at 869. He offers no proof that 177 days, the interval between the date of inspection and the date of testing, is too distant. Without concrete evidence or guidance from the State Toxicologist, we hesitate to make independent findings concluding that 177 days is outside the "not-too-distant past."

■ Berger next contends that the operator did not have personal knowledge of the serial number of the Intoxilyzer. He suggests that if the operator did not personally record the serial number of the Intoxilyzer, then the test result should be excluded on the basis of insufficient personal knowledge. He relies upon Rule 602, N.D.R.Ev., for his contention. Rule 602 reads:

> "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This rule is subject to the provisions of Rule 703, relating to opinion testimony by expert witnesses."

The arresting officer testified that the Intoxilyzer 5,000 is programmed to print its serial number on the Intoxilyzer Test Record. The Commissioner contends that this is a highly reliable result because this process requires no analysis. The approved method promulgated by the State Toxicologist does not require that the operator personally record the serial number of the machine. We cannot state that the failure of the operator to personally record the serial number is an indication of untrustworthiness so as to exclude the test result from admissibility at an administrative hearing.

■ Berger finally argues that the simulator is a device required to be inspected or approved as a foundational requirement. The Commissioner argues that this issue is not properly before the Court. The Commissioner again relies upon Section 28–32–15, N.D.C.C. It may well be that this issue was not stated with particularity in Berger's specifications of error. However, we find that this issue was raised in the administrative hearing and we grant review to reiterate the rule in *Schense v. Hjelle*, 386 N.W.2d 888 (N.D.1986). In *Schense* we held that the individual simulator used during Intoxilyzer tests did not require certification or approval by the State Toxicologist. We said:

> "It is evident that the Legislature, by its use of the term 'devices' in the statute, did not intend to expand the certification and approval requirements of the

State Toxicologist to include auxiliary equipment that might be used in conjunction with a specific testing device, but merely recognized the need for a method of approving new testing equipment as it became available for use. We conclude that the term 'devices' as used in the statute refers to the testing equipment used to perform the chemical analysis of the subject sample, and not to auxiliary equipment or devices used during the testing procedure." *Schense*, 386 N.W.2d at 890.

*See also State v. Martin*, 391 N.W.2d 611 (N.D.1986).

We conclude that there was sufficient foundation for the hearing officer to find that the Intoxilyzer test had been fairly administered.

After reviewing the record, we conclude that the Commissioner's findings of fact are supported by a preponderance of the evidence; that the conclusions of law are sustained by those findings; and that the Commissioner's decision is supported by the conclusions of law and that no due process violations are evident.

The judgment of the district court is affirmed with statutory costs on appeal to the appellee.

VANDE WALLE, GIERKE, LEVINE and MESCHKE, JJ., concur.